NOT FOR FULL-TEXT PUBLICATION
File Name: 08a0219n.06

Filed: April 24, 2008

Nos. 06-6136, 06-6468

# UNITED STATES COURT OF APPEALS
# FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| TERRY SMITH, | ) | |
| | ) | |
| **Plaintiff-Appellee,** | ) | ON APPEAL FROM THE |
| | ) | U N I T E D   S T A T E S |
| v. | ) | DISTRICT COURT FOR |
| | ) | THE EASTERN DISTRICT |
| BAYER CORPORATION | ) | OF TENNESSEE |
| LONG TERM DISABILITY | ) | |
| P L A N   a n d   B A Y E R | ) | **O P I N I O N** |
| CORPORATION, | ) | |
| | ) | |
| **Defendant-Appellants.** | ) | |
| _____ | ) | |

**Before: MOORE and GRIFFIN, Circuit Judges; TARNOW,*** **District Judge.**

**TARNOW, District Judge.** The defendants, Bayer Corporation Long Term

Disability Plan and Bayer Corporation (collectively, Bayer) appeal from a district

court ruling that granted long-term–disability (LTD) benefits and partial-disability

benefits to the plaintiff, Terry Smith, a former Bayer employee, pursuant to the

provisions of the Employee Retirement Income Security Act (ERISA), 29 U.S.C.

---

*The Honorable Arthur J. Tarnow, United States District Judge for the Eastern District of
Michigan, sitting by designation.

§§ 1001–1461. The defendants allege that the initial decision of the ERISA plan administrator to deny benefits to Smith was neither arbitrary nor capricious and, therefore, should have been upheld by the district court.

Our decision divides the applicable time period into three segments. The first segment consists of the first six months when Smith could have received long-term–disability benefits. The last segment starts when Smith began working at Target. The second segment begins after the first six months Smith could have received LTD benefits and ends before Smith started at Target.

We affirm the judgment entered below as to Smith's entitlement to LTD benefits during the first segment and as to the award of partial-disability benefits during the third segment. But we vacate the district court's award of LTD benefits during the second segment, because the district court did not consider the plan's definition of disability that applies after the first six months of receiving LTD benefits. We remand to the district court the issue whether Smith is due benefits in this second segment.

## FACTUAL AND PROCEDURAL BACKGROUND

The resolution of this dispute involves an analysis of the plan language and of the various bits of medical evidence contained in the administrative record.

By way of summary, under the plan, there is one definition of disability during the first six months of LTD benefits. For a claimant to receive benefits during the first six months, this definition requires that the claimant be unable to perform the essential duties of the regular occupation that he had before he became disabled. Another, more stringent standard governs after the first six months. To receive benefits after the first six months, a claimant has to show that he cannot perform any occupation, not merely that he is unable to perform his regular occupation.

The district court opinion in this matter painstakingly detailed the medical evidence and provides an accurate summary of the information relied upon by the parties to this appeal. In his Memorandum Opinion, the district judge explained as follows:

> Smith, now age 50, was employed by Bayer in Knoxville, Tennessee, as a Diabetes Sales Specialist, which is a field representative responsible for the sale of diabetes-related supplies. According to Bayer's Occupational Demands Form, this position required Smith to work with very little guidance or reliance on oral or written instructions; he was required to perform a wide range of tasks as dictated by variable demands and changing conditions; he was required to relate sensitive information to diverse groups; his position required the ability to work with diverse groups to obtain consensus on complex issues; he was expected to independently apply abstract principles to solve complex conceptual issues; and he was required to persuade or explain complex issues in person or by phone. Smith successfully worked in that position until January 10, 2003, when he stopped because of his depression, panic disorder, and bi-polar disorder. Smith then applied for short-term disability (STD) benefits by contacting Core, Inc. (Core), the claims

3

administrator for the STD plan, on January 17, 2003.

Core denied Smith's STD claim by letter dated February 21, 2003, stating that "there are insufficient quantitative objective physical findings to correlate with your subjective complaints and diagnostics to support a functional impairment that you are unable to do the essential functions of your job." Nevertheless, according to a letter dated April 14, 2003, from Bayer, Smith received STD benefits through April 2, 2003. In that same letter, Smith was informed that his application for [long-term disability (LTD)] benefits was also under review by Bayer's third-party administrator, Kemper. By letter dated May 14, 2003, Kemper denied Smith's claim for LTD benefits. Smith appealed that denial, but the cessation of his benefits was upheld by an ERISA Review Committee which met on January 17, 2004. This case was then filed on March 18, 2004. On October 21, 2004, the court granted the parties' joint motion to remand this matter to the plan administrator for reconsideration. The denial of Smith's benefits was again upheld on that remand by letter dated April 29, 2005. This case was subsequently reopened by agreed order filed on November 3, 2005.

The Plan provides LTD income and other benefits to employees who are disabled for more than 26 weeks. For these LTD benefits to begin, the participant "must be unable to perform the essential duties of [the participant's] regular occupation." After six months of receiving LTD benefits, the participant must be "'totally disabled'" to continue to be eligible for benefits. Under the Plan, "'[t]otally disabled' means you are unable to work at any job for which you are or could become qualified by education, training, or experience." A claimant is not disabled if his medical condition allows him to earn a wage comparable to his pre-disability earnings, in most cases 70% of the pre-disability wage. Under the Plan, it is the employee's burden to provide proof of entitlement for LTD benefits.

It must be noted, too, that disability benefits are paid from a voluntary employees' beneficiary association (VEBA) trust, funded in part by periodic contributions from Bayer, which is used exclusively to pay benefits to participants under the Plan or to pay expenses associated

4

with the Plan. Benefits are also funded in part by participants' salary reduction contributions.

The court will now examine in more detail the facts and circumstances surrounding plaintiff's claim, as well as the medical proof in support of the parties' respective positions. As previously noted, Smith quit working at Bayer on January 10, 2003, due to depression, panic disorder, and bi-polar disorder. In fact, Smith's medical records indicate that he had been treated for depression-related problems for almost a year before he quit working for Bayer. More specifically, those records reflect that Dr. Francis P. LeBuffe treated Smith on seven occasions from February 11, 2002, following plaintiff's release from the hospital for in-patient treatment of depression, through December 9, 2002. At the beginning of his treatment, Dr. LeBuffe noted that Smith's sleep was "a major problem" as he was only sleeping a couple of hours a night. Dr. LeBuffe also noted that Smith's mood was "still quite depressed." Nevertheless, Dr. LeBuffe's assessment was that Smith was "[d]oing ok[.]" In November 2002, after at least four other meetings, Dr. LeBuffe indicated that Smith's concentration was reduced. Again, however, Dr. LeBuffe's assessment was that Smith was "doing well[.]"

Dr. LeBuffe treated Smith two more times after he quit work on January 10, 2003. However, by June 18, 2003, Dr. LeBuffe indicated in his notes that Smith complained of decreased concentration as well as difficulty completing tasks. For example, Smith would forget to switch car gears and could not read a book. Further, these treatment notes reflect that Smith suffered from, among other things, ADD (Attention Deficit Disorder). By late June, Dr. LeBuffe's notes indicated that Smith was still suffering from ADD. By early August 2003, Smith complained of mood changes, irritability, and depression and his inability to pay attention and to concentrate was noted. Smith was, however, no longer suicidal. In September 2003, Smith reported mood swings to Dr. LeBuffe, as well as days when he felt lethargic, anxious and depressed. Dr. LeBuffe diagnosed Bi-Polar Disorder II and ADD.

The medical records also reflect that Dr. LeBuffe completed a medical assessment form on August 8, 2003. On that form, Dr. LeBuffe assessed Smith as "poor" with respect to the following general categories: (1) capacity to interact appropriately, communicate effectively, and engage in other aspects of social functioning; (2) abilities of concentration, persistence and pace; and (3) ability to adapt to stressful circumstances in work or work-like settings where failure to adapt results in repeated episodes of deterioration or decompensation which cause patient to withdraw or to experience an exacerbation of symptoms. Additionally, Dr. LeBuffe rated Smith as "poor" in the following specific areas: (1) dealing with the public; (2) persisting at assigned tasks; (3) the ability to relate to supervisors and co-workers; (4) the ability to work at a consistent pace for acceptable periods of time; and (5) the ability to timely complete tasks commonly found in work settings. Dr. LeBuffe then concluded his evaluation with diagnoses of recurrent and severe major depression and panic disorder to support his assessment.

While Smith was being evaluated by Dr. LeBuffe, Bayer hired third-party claims administrator Kemper to review Smith's file. The record reflects that Kemper ordered a peer-to-peer review, which was completed by Dr. Lawrence Burstein on May 9, 2003. Dr. Burstein did not review any medical records at that time, but he did speak with Dr. LeBuffe and reported that Dr. LeBuffe "indicated that Mr. Smith believes that he will have a panic attack if he returns to work" and "acknowledged that Mr. Smith does not display significant symptoms and, aside from Mr. Smith's belief, there are no barriers to his returning to work." Consequently, Dr. Burstein concluded that there was no reason that plaintiff was "unable to perform the core elements of his occupation from a psychological perspective." On the basis of Dr. Burstein's report, Kemper denied Smith's LTD claim.

Smith, through his attorneys, then appealed Kemper's denial to Bayer's ERISA Review Committee on October 23, 2003. The appeal letter was accompanied by Dr. LeBuffe's outpatient progress notes covering the period from November 1, 2002, through September 16,

2003. These materials also contained Dr. LeBuffe's assessment prepared on August 8, 2003. All of these materials were then submitted by Kemper to Dr. Elana Mendelssohn, a clinical psychologist and neuropsychologist.

Dr. Mendelssohn completed her peer review on November 10, 2003. Although Dr. Mendelssohn reviewed Dr. LeBuffe's medical records, she advises the reader to refer to Dr. Burstein's peer review "to obtain further detail of the previously reviewed documentation." Dr. Mendelssohn pointed out that Smith reports experiencing emotional difficulties, but concluded that "the submitted documentation by Dr. LeBuffe do [sic] not provide objective examination findings or behavioral observations substantiating how the claimant's difficulties are impacting his functioning and preventing him from performing the core elements of his occupation."

On November 19, 2003, Dr. Mendelssohn prepared an addendum to her report after reviewing notes from Norma Albanese, APRN. In that addendum, Dr. Mendelssohn concluded that "the submitted documentation fails to describe a severity and intensity of psychiatric symptoms in objective mental status terms to preclude work."

The ERISA Review Committee, through a peer review organization, then requested an independent review of the file by a qualified physician. On December 12, 2003, Dr. Paul Orr, a board-certified psychiatrist and neurologist, completed a record review of Smith's claim file, including the opinions of the previous file reviewers. Dr. Orr noted that both Dr. Burstein and Dr. Mendelssohn could not support cognitive impairments preventing Smith from performing his regular occupation. Dr. Orr further noted that Dr. LeBuffe had opined that Smith was "[c]urrently unable to work [and] unable to work in sales." Dr. Orr also observed that, despite Smith's reported panic problems, Smith was able to attend a real estate course and even obtain his license. Although Smith was hospitalized for depression in 2002 and was under the regular care of a psychiatrist from that point forward, Dr. Orr notes that there had been no mention of any psychiatric difficulties prior to Smith's leaving Bayer in January 2003. Dr. Orr was of the opinion, therefore, that Smith was not disabled from performing his job

in sales or any position for which he could be trained.

On January 15, 2004, the ERISA Review Committee denied Smith's appeal, concluding that the record did not support a finding that he was unable to perform the essential duties of his regular job. As previously noted, Smith filed this action on March 18, 2004.

During the course of this litigation, the parties became aware of some procedural irregularities and agreed to remand the claim for further review. Also, during the pendency of this litigation, Smith relocated to Missouri where he was treated by Dr. Robert McCool, a board-certified psychiatrist, for his mental health issues. During this time, Smith began working as a laborer at a Target store, making considerably less money than he earned with Bayer. Specifically, beginning on May 5, 2004, Smith began earning wages of $1,083.33 per month, which represents approximately 22% of his pre-disability earnings.

In his sworn statement submitted on remand, Dr. McCool offered the opinion that Smith would have "a lot of difficulty being able to sustain the level of work that he had previously done in the type of sales position that he was accustomed to working in the past." Dr. McCool also testified that while Smith is "somewhat stable" at his current job, he is still "struggling at the level of employment that he is working and he has had some difficulties at times." According to Dr. McCool, Smith is able to maintain his current level of employment because "the work requirements are somewhat limited" and because this job does not require initiative or impose pressure on Smith. Dr. McCool also expressed doubts as to whether Smith would be able to maintain even this level of employment over the long term.

Dr. McCool's treatment notes accompanied his sworn statement. According to these notes, Smith reported suicidal thoughts, depressed mood, and lack of motivation and concentration. Although Smith reported "feeling pressured at work," he actually received an Employee of the Month award which was "encouraging to him."

Also during the remand, Smith submitted a sworn statement from

8

his previous treating psychiatrist, Dr. LeBuffe. In that statement, Dr. LeBuffe indicated that his assessment of Smith's limitations on his medical opinion form in August 2003 was based on his personal observations. Additionally, Dr. LeBuffe pointed out that when he first saw Smith during his hospitalization, Smith was "totally unable to function on his own at that time." Dr. LeBuffe further explained that Smith exhibited symptoms of his panic disorder during the time in which he treated him.

Moreover, upon inquiry by counsel regarding the so-called lack of objective findings relied on by the doctors for Kemper, Dr. LeBuffe testified as follows:

> Well, I assume that they meant that there were no observable symptoms at that time, but like with most of our patients, we largely rely on patients' report of symptoms. It is also the nature of panic disorder that the symptoms occur in discrete attacks which last sometimes very briefly but leave a dread and an inability to face certain situations that persist in between attacks.
>
> So when you see a person in the office, they may be relatively calm but still have that condition and still may be quite disabling [sic].

Finally, Dr. LeBuffe elaborated on comments he had made to Dr. Burstein which had been interpreted by Burstein as meaning that Smith was only hindered in his return to work only by his fear of having a panic attack. Dr. LeBuffe testified that Dr. Burstein's recapitulation of their conversation was inaccurate, explaining that panic in anticipation of certain events and avoidance of those events are characteristic of panic disorders. Dr. LeBuffe also testified that Smith's panic and mood disorders were not caused by his employment with Bayer; rather, they were present before he ever began that position. Dr. LeBuffe again opined that Smith was "disabled" during the entire time while Dr. LeBuffe treated him.

The record also contains a report by vocational expert Mark Boatner, M.Ed., CRC, LPC, dated January 17, 2005. To prepare that report, Mr. Boatner reviewed the sworn statements of Dr. LeBuffe and Dr. McCool, as well as the assessment of mental limitations completed by Dr. LeBuffe on August 8, 2003, a psychiatric evaluation dated May 27, 2004, and treatment notes through November 23, 2004. In his report, Mr. Boatner noted, among other things, that Smith's former employment as a pharmaceutical representative was "highly demanding, stressful and requires focus, attention, concentration, poise, and other high level attributes of a person." In contrast, he noted that Smith's current job as a store laborer at Target is one which is "'unskilled.'" Mr. Boatner then defined "unskilled" as work in which the "worker does not have great control over tasks and merely follows orders, takes instructions and generally does what he is told." Mr. Boatner then concluded his report as follows:

> For whatever reason, Mr. Terry Smith was overcome with major depression and a diagnosis of Bi-Polar II Disorder. He has obtained professional help and has made progress. However, it seems unlikely that he would accept this lower level of remuneration unless he did not have any other choice. I believe he is to be praised for his effort to regain productivity. I am sure that if and when he achieves a greater level of mental health he would seek work more appropriate with his earlier and higher level of responsibility and wage. However, I am not aware of any reliable method to predict his rate of recovery. I do believe that if he remains labile as indicated by the treatment notes of Dr. McCool that he is probably working at the highest possible level of which he is capable at this time. He probably needs more highly structured work assignments and greater physical demands tha[n] more control over tasks and lighter physical demands. I would state that the present level of employment is more therapeutic for him as an adjunct to the therapy provided by Dr. McCool. Likewise, as indicated by the statements of the treating psychiatrists and by my professional experience with job

10

placement of individuals with major depression, he would likely do poorly if placed in a job that made more demands upon his resources. He is most likely "doing the best that he can." His situation is exemplary of why it is difficult for psychiatrists to rate mental impairment with a numerical percentage that might translate into a "disability rating." Unless he achieves a higher level of mental/emotional functioning, he is probably earning about as much money as could reasonably be expected of him. He might improve his position in the future or he might not be able. There does not seem to be enough information about his status to be more definitive than that.

I have based my conclusions on a reasonable degree of vocational rehabilitation certainty.

The ERISA Review Committee again obtained an independent medical evaluation of Smith's claim. On March 29, 2005, Dr. Stuart S. Burstein, a board-certified psychiatrist, issued a report based upon his review of the record, including the materials provided with the January 18, 2005, letter. Dr. Burstein noted that Smith's records "indicate that he has gone through episodes of Major Depression and Panic Disorder [and that] it has been opined that he has Bi-polar Disorder II and Attention Deficit Disorder." Nevertheless, Dr. Burstein concluded as follows:

> There is no indication of [Smith's] experiencing a degree of psychiatric illness that would interfere with his functioning satisfactorily as a pharmaceutical sales representative for Bayer Corporation. There likewise is no indication that he lacks the mental ability to work at any job for which he is or could become qualified by education, training, or experience.

Dr. Burstein then supports that conclusion by pointing out that Smith "completed a real estate agent's program, passed the certification exam,

handled the difficulties of a divorce and the challenges of remarriage, relocated, and found other work for himself."

On April 29, 2005, the ERISA Review Committee issued a determination reaffirming its original decision to deny Smith's claim. The determination letter noted the disagreement between the conclusions reached by Drs. LeBuffe and McCool, on the one hand, and the two independent medical reviewers, Drs. Orr and Burstein, on the other hand. The Committee also advised Smith that it accepted the conclusions of the independent reviewers for a number of reasons, which are itemized in the determination letter. The Committee further determined that partial disability benefits are not applicable in Smith's situation but are intended for situations in which an employee returns to work for Bayer in a reduced capacity because of a partially disabling condition.

By letter dated June 29, 2005, Smith, through his attorney, requested reconsideration of the denial of his claim. The letter also submitted a report from Dr. McCool and updated progress notes. Dr. McCool stated that he had reviewed the ERISA Review Committee letter, as well as the report of Dr. Burstein. Dr. McCool then opined that, while Smith is not totally disabled, he would not be able to handle the stressors that would be involved with a pharmaceutical sales job. However, Dr. McCool did not address the issue of whether Smith was capable of handling other types of employment for which he was qualified.

These additional materials were again submitted to Dr. (Stuart) Burstein, who provided the committee with a report dated July 15, 2005. In that report, Dr. Burstein responded specifically to Dr. McCool's letter, which indicated that Smith could not handle the stressors of being a pharmaceutical sales representative. Dr. Burstein opined as follows:

> I opine differently [from Dr. McCool], and I do so in part out of recognition for Mr. Smith's not only handling the routine duties of his job as a Salesperson at Target, but also handling the stressors of a reminder of his previous positions, a change in his personnel director, and a temporary assignment to work at night. Those stressors

12

challenged Mr. Smith, as he might be challenged in a job as a Pharmaceutical Sales Representative. He has demonstrated a capacity to handle such challenges.

Thus, Dr. Burstein again concluded that, even considering these most recent submissions, Smith was fully able to function as a pharmaceutical sales representative.

Finally, in a letter dated August 10, 2005, the ERISA Review Committee informed Smith that its denial of disability benefits would be reaffirmed, explaining fully its reason for doing so. The Committee noted that, even had Smith qualified for disability benefits before he returned to work on May 5, 2004, his acceptance of that employment would, in any event, have terminated his eligibility for further benefits under a provision of the Plan that benefits terminate when a participant "'return(s) to employment at any job or become(s) self employed, regardless of whether or not you are compensated, other than an approved rehabilitation program.'" This case was subsequently reopened by order dated November 3, 2005.

*Smith v. Bayer Corp. Long Term Disability Plan*, 444 F. Supp.2d 856, 860–67 (E.D. Tenn. 2006) (footnotes and citations to administrative record omitted).

The district court first recognized that, because the ERISA plan accorded the plan administrator discretion in the grant or denial of benefits, any decision of the administrator could be reviewed only to determine whether the conclusion was arbitrary or capricious. The court then concluded that the decision to deny Smith long-term–disability benefits did indeed fail to satisfy even such a deferential standard. In reaching that conclusion, the district court noted that the only evidence

supporting the assertion that the plaintiff was able to resume his prior position as a pharmaceutical-sales representative was offered by individuals who never met personally with Smith, despite the difficulties in diagnosing psychological illnesses from cold medical records. *See id.* at 874. The district court also ruled that, due to the plan's improper denial of LTD benefits, the plaintiff should not be penalized for his efforts to find employment with Target in order to support himself. Thus, the court ordered that the plan pay partial-disability benefits to Smith to compensate him for the monetary disparity between his Target salary and the long-term–disability benefits he should have been receiving. *See id.* at 875. Consequently, the court entered judgment against Bayer for $131,777.51 in past-due benefits and prejudgment interest, future monthly benefits of $2,968.31 per month, post-judgment interest, and pension credit time. (JA 80) Bayer now appeals.

## DISCUSSION

### I. Standard of Review

Ordinarily, this court reviews a challenge to the denial of ERISA benefits *de novo*. *See Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101,115 (1989). If the plan in question grants to the administrator discretionary authority to determine

benefit eligibility, however, we examine those determinations under the arbitrary-or-capricious standard of review. *See Calvert v. Firstar Fin., Inc.*, 409 F.3d 286, 291–92 (6th Cir. 2005). "The arbitrary or capricious standard is the least demanding form of judicial review of administrative action. When it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, that outcome is not arbitrary or capricious." *Davis ex rel. Farmers Band & Capital Trust Co. of Frankfort, Ky. v. Ky. Fin. Cos. Ret. Plan*, 887 F.2d 689, 693 (6th Cir. 1989) (quoting *Pokratz v. Jones Dairy Farm*, 771 F.2d 206, 209 (7th Cir. 1985)). Although review pursuant to the arbitrary-or-capricious standard is thus extremely deferential, "[i]t is not, however, without some teeth. Deferential review is not no review, and deference need not be abject." *McDonald v. Western-Southern Life Ins. Co.*, 347 F.3d 161, 172 (6th Cir. 2003) (citations and internal quotation marks omitted). It "does not require us merely to rubber stamp the administrator's decision. Instead, we are required to review the quality and quantity of the medical evidence and the opinions on both sides of the issues." *Glenn v. Metlife*, 461 F.3d 660, 666 (6th Cir. 2006) (internal quotation marks and citations omitted), *cert. granted*, 128 S.Ct. 1117 (U.S. Jan. 18, 2008) (No. 06-923).

In this litigation, the parties agree that the Bayer plan administrator was granted discretion in determining eligibility for receipt of disability benefits. Both Smith and

15

Bayer thus concede that the administrator's decision must be upheld unless it can be deemed arbitrary or capricious. The crux of the dispute between the parties is, therefore, simply whether Bayer's decision to rely upon the opinions of experts who merely reviewed medical records, to the exclusion of the opinions offered by treating psychiatrists, amounts to an unreasoned, unsupported determination.

## II. Eligibility for Short-Term–Disability Benefits

Before discussing the issues over which the parties disagree, it is important to note that Smith never raised in his district court complaint a challenge to Bayer's denial of *short*-term–disability benefits. Although a January 18, 2005, letter from Smith's counsel to the plan administrator notes that "Mr. Smith is appealing the denial of any short-term disability (STD) benefits that should have been paid under the STD plan, and . . . the denial of any long-term disability (LTD) benefits that he should have been paid based on his disability," (JA 263) the complaint itself seeks relief only from the defendants' "refusal to pay Long-Term Disability benefits due under an employee benefits plan." (JA 7) Furthermore, Smith has not appealed to this court from the district court's ruling that "there is no claim for STD benefits which meets the requirements of Fed. R. Civ. P. 8(a), *i.e.*, 'a short and plain statement of the claim showing that the pleader is entitled to relief . . . .'" *Smith*, 444 F.Supp.2d at 860 n.3. (JA 18)

## III. Eligibility for Long-Term–Disability Benefits

Generally, pursuant to the terms of Bayer's plan, an employee becomes entitled to long-term–disability benefits if he or she is continuously disabled for more than 26 weeks. Specifically, "[f]or LTD benefits to begin, you must be unable to perform the essential duties *of your regular occupation*." (Emphasis added.) (JA 187) After six months of receiving long-term–disability benefits, however, a claimant "must be 'totally disabled' to continue eligibility for benefits. 'Totally disabled' means [the employee is] unable to work at *any job* for which [he or she is] or could become qualified by education, training, or experience." (Emphasis added.) (JA 187) The summary plan description continues by explaining:

> You may not be considered totally or partially disabled under this Plan when your medical condition allows you to earn a wage comparable to your earnings before you became disabled. For most purposes, a comparable wage would be considered as 70% or higher of your pre-disability earnings. However, the final decision regarding benefit eligibility rests solely with the company.

> The company, through the plan administrator, reserves the exclusive right to determine if you are totally or partially disabled. The company's decisions will be final, subject to appeals procedures.

(JA 188)

## A. First Six Months of Long-Term Disability

In order to be entitled to receive the first six months of *long-term*–disability benefits after the cessation of short-term–disability benefits, plaintiff Smith was required to establish that he could not "perform the essential duties of [his] regular occupation." As summarized by the district court in its memorandum opinion in this matter, Smith's position with Bayer as a Diabetes Sales Specialist required him "to work with very little guidance or reliance on oral or written instructions"; "to perform a wide range of tasks as dictated by variable demands and changing conditions"; "to relate sensitive information to diverse groups"; "to work with diverse groups to obtain consensus on complex issues"; "to independently apply abstract principles to solve complex conceptual issues"; and "to persuade or explain complex issues in person or by phone." *Smith*, 444 F. Supp.2d at 860.

Smith's treating psychiatrists, Francis LeBuffe and Robert McCool, both testified during depositions that, based upon their in-person therapeutic sessions with the plaintiff, they did not believe that Smith was able to perform such complex tasks adequately. For example, LeBuffe testified that, when the doctor first had contact with Smith, the plaintiff was "totally unable to function on his own." (JA 332) Although Smith did make some progress from that totally dependent mental state, he was, in LeBuffe's opinion, still "disabled during that entire period" that LeBuffe

18

treated him and was not capable of returning "to a high-paying type job that would be a demanding difficult job such as being a drug rep." (JA 339)

McCool's sessions with Smith led the plaintiff's second treating psychiatrist to conclude that the patient continued to suffer from depression and that Smith experienced occasional thoughts of suicide. McCool further offered his opinion that:

> I think [Smith] would, at this point in time, have a lot of difficulty being able to sustain the level of work that he had previously done in the type of sales position that he was accustomed to working in the past. I think he would have a lot of difficulties interfacing with other people and would have difficulty showing his own initiative, which was a requirement that he had at previous jobs and just maintaining the pace that he was required to have in his previous employment.

(JA 304) Indeed, Dr. McCool reported that Smith described "some struggles [simply] maintaining the employment" at Target as a laborer/stocker. (JA 306)

By contrast, when the plan administrator concluded that Smith was not prevented by his depression, panic attacks, attention deficit disorder, and bipolar disorder from functioning in his former occupation, the plan administrator relied upon experts who never once met with the plaintiff in person. One of these experts, Lawrence Burstein, a psychologist, not a psychiatrist, spoke with LeBuffe to "clarify Mr. Smith's status," but then mischaracterized the treating physician's comments by implying that the only barrier to the plaintiff's return to work was Smith's own fear

19

that he *might* suffer a panic attack were he to do so. (JA 120) In fact, however, as LeBuffe himself mentioned during his deposition testimony:

> I don't think that [Burstein's characterization] is accurate. I think it's – an accurate statement would be that Mr. Smith was having a lot of panic with anticipation of return to work, and that kind of triggering of panic symptoms due to anticipation is an essential part of the condition.
>
> When the patient contemplates the imminence of stressful events, they begin to experience panic, and it can be uncontrollable, but that is very – extremely characteristic of that condition.

(JA 336-37). The plan procedures never gave LeBuffe the opportunity to contemporaneously verify that Burstein's notes accurately reflected LeBuffe's opinion. Burstein, for instance, did not give LeBuffe a copy of the notes Burstein made to support the view that Smith was able to work.

Similarly, the second expert contacted by Bayer, Elana Mendelssohn, was also not a medical doctor but rather a clinical neuropsychologist. Mendelssohn, in detailing the bases for her opinion that Smith did not suffer from functional impairments that precluded a return to his former occupation, never mentioned LeBuffe's diagnoses of attention deficit disorder and bipolar disorder. Instead, she focused upon the plaintiff's own comment to LeBuffe that he felt "pretty much OK" on April 9, 2003, and that he was "doing better" on September 16, 2003. (JA 122) Those expressions of relative improvement, however, were not placed in proper

context by Mendelssohn. Given the fact that Smith had been previously hospitalized due to his mental condition and was, at that time, completely unable to function on his own, his subsequent claim that he was "doing better" clearly does not justify the conclusion that he was ready to return to a high-stress work environment. Finally, as noted by the district judge, Mendelssohn's reference to the plaintiff's "*impairments in the areas of communication, concentration, adaptability, and interacting with the public*" (JA 122) significantly understates the clinical findings of a physician who personally examined the claimant. *Smith*, 444 F. Supp.2d at 872. In fact, LeBuffe concluded that the plaintiff's abilities in those listed areas were not simply "impaired," but were "limited to poor" and that Smith would be considered to be "usually precluded" from functioning in those areas. (JA 332)

Smith's records were eventually reviewed by two medical doctors at Bayer's request. Again, however, those doctors did not actually see or interview the plaintiff; instead, they relied upon records compiled by LeBuffe and by Bayer's other reviewing "experts" who also did not meet with the plaintiff in person. Psychiatrist Paul Orr, after listing the documents he reviewed, concluded that Smith was disabled neither from performing his original occupation nor from "employment in any position for which he is or could become qualified for by education, training or experience." (JA 128) Unfortunately, however, Orr seemed to ground his decision

21

on the fact that the plaintiff "was able to attend a course in Real Estate and obtain his license" and the perception that "[h]e appears interested in pursuing a career in Real Estate Sales." (JA 128) Despite those "successes" and aspirations highlighted by Orr, there is no evidence that plaintiff Smith was actually ever able to enter the real-estate–sales field. Besides, Smith passed his real-estate exam not during the claimed period of disability, but while he was still working for Bayer in 2002. (JA 101) Orr's conclusions, therefore, are not supported by the actual facts presented by Smith's history.

The final reviewer of the plaintiff's medical files was Stuart Burstein, a psychiatrist in Pittsburgh, Pennsylvania. Dr. Burstein, like the other reviewers whose opinions form the basis of Bayer's non-disability decision, did not treat, interview, or otherwise interact with the plaintiff, but simply examined charts and reports compiled by LeBuffe, McCool, and the previously-mentioned record reviewers. After his document examination, Burstein noted that Smith "completed a real estate agent's program, passed the certification exam, handled the difficulties of a divorce and the challenges of remarriage, relocated, and found other work for himself." (JA 378) As a result of the plaintiff's "successful" performance of those tasks (even though there is no evidence Smith pursued his real-estate career), Burstein concluded that "Mr. Smith's carrying them out indicates a level of mental health that would readily

22

accommodate his working at a job for which he is or could become qualified by education, training, or experience." (JA 378) Furthermore, he stated that Smith's "handling [of] the routine duties of his job as a Salesperson at Target [and] also handling the stressors of a reminder of his previous positions" indicated that he could resume "his former duties as a Pharmaceutical Sales Representative for Bayer." (JA 410)

Of course, contrary to the implications in Burstein's report, Smith was not a salesperson at Target, but rather a laborer charged with the responsibility only of restocking shelves at the direction of a supervisor. Additionally, as noted by the district court, the ability of an individual to divorce, remarry, and to move to a different city for a low-paying job is "irrelevant to whether or not Mr. Smith can persist at an occupation." *Smith*, 444 F. Supp.2d at 873. And as stated earlier, Smith passed his real-estate exam before the onset of his disability, and there is no evidence he ever successfully pursued a real-estate career.

In the face of the district court's ruling that the plan administrator's reliance on the opinions of the file reviewers was, in this instance, arbitrary and capricious, Bayer correctly argues that this court has recognized that the opinions of treating physicians should not necessarily be accepted over those of reviewing experts simply because

the treating physicians physically examined the claimant.  *See Calvert*, 409 F.3d at

293-94.  Nevertheless, as further explained in *Calvert*:

> [W]hile we find that [the plan administrator's] reliance on a file review
> does not, standing alone, require the conclusion that [the plan
> administrator] acted improperly, we find that the failure to conduct a
> physical examination – especially where the right to do so is specifically
> reserved in the plan – may, in some cases, raise questions about the
> thoroughness and accuracy of the benefits determination.

*Id.* at 295.

Bayer's plan did indeed reserve to the company the right to order physical

examinations and therapy sessions for the plaintiff.  (JA 190) The failure of the

administrator to take advantage of that option, especially when faced with a claim of

mental and emotional instability, is both puzzling and troubling for the very reason

identified not only by the district court in this litigation, but also by the District Court

for the Southern District of New York in *Sheehan v. Met. Life Ins. Co.*, 368 F.

Supp.2d 228, 254-55 (S.D.N.Y. 2005):

> Courts discount the opinions of psychiatrists who have never seen
> the patient for obvious reasons.  Unlike cardiologists or orthopedics,
> who can formulate medical opinions based upon objective findings
> derived from objective clinical tests, the psychiatrist typically treats his
> patient's subjective symptoms. . . .  [W]hen a psychiatrist evaluates a
> patient's mental condition, "a lot of this depends on interviewing the
> patient and spending time with the patient," . . . a methodology essential
> to understanding and treating the fears, anxieties, depression, and other
> subjective symptoms the patient describes.

24

Although the court in *Sheehan* engaged in *de novo* review, *see id.* at 252, *Sheehan*'s point is still relevant for our, albeit deferential, review of the medical evidence, because *Sheehan* highlights the inadequacy of record review when determining benefits for someone claiming a mental disability. An examination could have helped the plan administrator to better evaluate the severity of Smith's symptoms. *See also Smith v. Continental Cas. Co.*, 450 F.3d 253, 263 (6th Cir. 2006) (under arbitrary-or-capricious standard, where credibility determination was key component of assessing disability, reliance solely on file review, without an independent examination, was inadequate).

Though Bayer characterizes the district court decision as importing a treating-physician rule contrary to *Black & Decker Disability Plan v. Nord*, 538 U.S. 825, 832 (2003), the district court did not do so. Rather, the district court deemed arbitrary and capricious the plan administrator's refusal to credit Smith's reliable evidence. *See Nord*, 538 U.S. at 834. That Bayer can point to opinions from its own experts does not insulate its decision from review, because we must "review the quality and quantity of the medical evidence and the opinions on both sides of the issues." *See McDonald v. Western-Southern Life Ins. Co.*, 347 F.3d 161, 172 (6th Cir. 2003). Based on the facts of this case, rather than on a blanket rule of according outcome-determinative weight to treating or examining physicians, we determine that Bayer

arbitrarily and capriciously rejected Smith's evidence and breached its fiduciary duty to make certain that reliance on its experts' advice was reasonably justified under the circumstances. *See Gregg v. Transportation Workers of Am. Intern.*, 343 F.3d 833, 841 (6th Cir. 2003) (defendant union that administered benefits plan unjustifiably relied on expert advice in choosing among alternative insurance policies).

Given this obvious shortfall in the analytical framework used by the experts credited by the plan administrator, in conjunction with the numerous factual errors, misunderstandings, and analytical omissions of those persons reviewing the findings of Smith's treating psychiatrists, the administrative record contained no reliable evidence to support the conclusion that the plaintiff was competent to return to his previous occupation. Nor do Bayer's insinuations that Smith left work because of conflicts with his boss or his ex-wife comprise reliable evidence. Indeed, as noted by the district judge, "to . . . suggest that Smith's present employment as a stock handler supports [the] conclusion that Smith is able to handle his previous job as a pharmaceutical sales representative borders on the absurd. At a minimum, [that] conclusion is arbitrary and capricious." *Smith*, 444 F. Supp.2d at 874. The decision of the district court to award long-term–disability benefits to the plaintiff for that period of time when Smith demonstrated that he was "unable to perform the essential duties of [his] regular occupation" was proper and is affirmed.

**B. "Total Disability" After Six Months of Long-Term–Disability Benefits**

After determining that the administrator's decision that Smith could return to his previous occupation was arbitrary and capricious, the district court truncated its further analysis of the plaintiff's claim. As discussed, the "your regular occupation" standard of disability is only relevant for determining long-term–disability benefits for the first six months after the claimant's short-term–disability benefits cease. However, after October 3, 2003, Smith was required to meet the more stringent "totally disabled" standard of the plan in order to continue receiving LTD payments under the plan. Nevertheless, the district court's opinion does not specifically address Bayer's arguments about why Smith has not met his evidentiary burden in this regard. For the reasons that follow, we vacate the district court's award of long-term–disability benefits between October 4, 2003 and May 5, 2004 and remand this portion of Smith's claim.

### 1. Bayer's interpretation

Bayer contends that "total disability" under the plan is defined simply as the inability "to work at any job for which you are or could become qualified by education, training, or experience." (JA 187) Because Smith was able to secure employment as a stock handler at Target beginning in early May 2004, Bayer now

insists that, even if the plaintiff could not have returned to his previous job, he was not entitled to any long-term benefits once the more restrictive definition of "total disability" came into play in October 2003.

## 2. Smith's interpretation

Plaintiff cites another provision to support the district court's award of benefits after the first six months. The summary plan description states that "[y]ou may not be considered totally or partially disabled under this Plan when your medical condition allows you to earn a wage comparable to your earnings before you became disabled." (JA 188) Furthermore, "[f]or most purposes, a comparable wage would be considered as 70% or higher of your pre-disability earnings." (JA 188). In other words, if a benefits-plan participant receives a wage comparable to his pre-disability wage — that is, if a participant makes at least 70% of pre-disability income — then the participant may not be considered either totally or partially disabled.

Plaintiff argues that the purpose of the comparable-wage provision is to elaborate on the plan's primary definition of total disability. For instance, Smith subtly cobbles together plan language when he says that his disability prevented him from performing "any other occupation *for which he is suited* by experience, education[,] or training *that would provide a comparable wage*." Appellee br. at 15

28

(emphasis added). His argument goes like this: we know from the Plan that if a participant receives a comparable wage, then that person is not totally disabled. Therefore, argues the plaintiff, a plan participant who does not get a comparable wage must be totally disabled.

### 3. The court's interpretation

However, the inverse of the if-then statement is not a logically necessary conclusion. Even if a participant does not get a comparable wage, that participant might be able-bodied enough to work at some job. The plan only states that a participant is totally disabled when he cannot work at any job "for which [he is] or could become qualified by education, training, or experience." Contrary to Smith's interpretation, the plan does not state that a participant is totally disabled when he cannot work at any job that provides a comparable wage. Smith was still qualified to do stockhandler's work at Target, even though he was not deploying the full extent of his education, training, and experience. In other words, Smith's education, training, and experience did qualify him to do stockhandler's work, even though they qualify him to do higher-skilled work as well.

At oral argument, the court posed a hypothetical question where a rocket scientist suffered a disabling event that leaves him only able to be a hat-check

29

attendant. Under the plaintiff's interpretation, the scientist should receive benefits; the comparable-wage provision ensures that even though the scientist is not "unable to work at any job," checking hats does not afford him a wage comparable to his pre-disability salary, which in turn means that being a hat-check attendant is not a job for which he is qualified.

Our interpretation of the plan language addresses this situation. First, even under a definition of disability that requires a claimant to be unable to perform the duties of any — as opposed to the claimant's pre-disability — occupation, the Sixth Circuit has stated that "nominal employment, such as selling peanuts or pencils which would yield only a pittance does not constitute a business or occupation." *See VanderKlok v. Provident Life and Acc. Ins. Co.*, 956 F.2d 610, 614-615 (6th Cir. 1992). Second, the hypothetical claimant's recourse under the court's interpretation of the plan language is to file a claim for partial disability. In this way, the scientist or pharmaceutical-sales representative who is cornered into being a stockhandler can still receive some benefits to compensate for the reduction in income that accompanies his loss of capacity to work at his or her regular job. Third, the option of partial-disability status explains the purpose of the language that a claimant must be unable to work at a job "for which [he is] or could become qualified by education, training, or experience." This language points to the situation where the plan

30

administrator would likely need to examine a long-term–disability claimant at the six-month juncture to determine the universe of jobs for which the claimant is qualified, or failing that, the jobs that the claimant could become qualified for with some training. Even if those jobs that a claimant could become qualified for, or the jobs that the claimant is already qualified for without any additional training, provide less than a comparable wage, the claimant can still receive partial benefits. Finally, the purpose of the comparable-wage provision, instead of being read as a gloss on the definition of total disability, can be interpreted as another sieve through which claims of partial and total disability can be shaken. The comparable-wage language is an attempt to forestall a claimant from collecting benefits in the surprising situation when she gets an income that is similar to or greater than what she earned before her disability. *See Giampa v. Trustmark Ins. Co.*, 73 F. Supp. 2d 22, 23, 27 (D. Mass. 1992) (where no comparable-wage provision existed in plan, chiropractor who shifted from treating patients to managing chiropractic facilities due to injury could still collect disability benefits in spite of higher post-disability income). This unusual situation is possible in plans without comparable-wage provisions, because disability insurance hedges against loss of capacity to work, not loss of income. Ordinarily, losing the ability to work means losing income, but not always.

31

## 4. Next steps

The internal claim process and district court litigation concerned whether Smith was entitled to long-term–disability benefits in the first place. Therefore, both of the plan administrator's denials — on January 15, 2004 and April 29, 2005 — did not expressly consider whether Smith met the post–six-month definition of total disability. *See* JA 90 (first denial), 383-86 (second denial). Smith did explain his claim by letter to the Plan Administrator as a claim for total disability from the date his LTD benefits could have begun (April 3, 2003) until the date he started work at Target (May 5, 2004). *See* JA 263. However, his complaint only makes a claim for "benefits" without making any particular claim about total disability, as opposed to disability in general. *See* JA 9-10, ¶¶ 20, 21. Therefore, even if Smith is not "totally disabled" under the post–six-month standard, he has not waived a claim for partial-disability benefits.

The district court did not expressly explain how Smith met the post–six-month definition of total disability. Rather, the court seems to assume that he is totally disabled because it awarded Smith full long-term benefits not only for the first six months he should have received benefits, but even after that first six months. *See* JA 64.

Therefore, we reverse and remand to the district court the portion of Smith's claim that deals with LTD benefits after the first six months and before he started working at Target. In other words, the district court, and ultimately, the plan administrator, should consider whether Smith showed that (1) he was totally disabled under the "unable to work at any occupation" definition of disability from October 4, 2003 until May 5, 2004; or whether Smith showed that (2) he was partially disabled during the same time period. The district court, and ultimately, the plan administrator, should have the initial chance to address this question. *See Killian v. Healthsource Provident Administrators, Inc.*, 152 F.3d 514, 522 (6th Cir. 1998) (although plan administrator arbitrarily and capriciously failed to consider certain evidence, remand to Administrator to consider this evidence was appropriate course).

In addition to dealing with Smith's claim for LTD benefits, the district court and plan administrator should also consider whether Smith alternatively would have been eligible for partial-disability benefits during this time period. Smith and the plan administrator were focused on whether Smith was disabled under the first-six-months standard. That issue is a necessary predicate to, but does not decide, whether Smith would continue to get benefits under the more restrictive definition of disability. Furthermore, because the plan administrator was arbitrary and capricious

33

in denying Smith benefits under the more lenient definition of disability, it is unfair to expect Smith to have made the case for partial disability.

## III.  Eligibility for Partial-Disability Payments

In a final argument, Bayer suggests that even if the district court correctly awarded Smith long-term–disability benefits for the period between April 3, 2003, and the May 5, 2004 start of his employment with Target, the commencement of that job would have resulted in the termination of further payments to the plaintiff.  Thus, contends Bayer, the award of partial-disability benefits for any time period after May 5, 2004 contravened the plan and was, therefore, erroneous.  In support of this argument, the defendants highlight two provisions of Bayer's summary plan description.  The first of those provisions explains that long-term disability benefits are available only "if you are partially disabled or participate in a rehabilitation program . . ., whether formal or informal, [that has been] approved in writing by the company medical representative and the claims administrator. . . ."  (JA 188)  The second provision states plainly that "[b]enefits will stop automatically if you . . . [r]eturn to employment at any job or become self-employed, regardless of whether you are compensated, other than a claims administrator-approved rehabilitation program for which you are qualified by reason of your education, training or experience." (JA 189)

Bayer's reliance upon this second provision in its argument against payment of partial-disability payments to Smith after May 5, 2004 is improper. "When interpreting ERISA plans, federal courts apply 'general rules' of contract law as part of the federal common law." *Cassidy v. Akzo Nobel Salt, Inc.*, 308 F.3d 613, 615 (6th Cir. 2002). As such, "courts interpret ERISA plan provisions according to their plain meaning, in an ordinary and popular sense," giving effect to any unambiguous terms. *Id.* at 617-18 (internal quotation marks and citations omitted). According the words of the relevant provision of the Bayer plan their usual and ordinary meaning, the contract simply specifies that an unapproved return to employment, whether compensated or not, will result in the *stoppage* of benefit payments. Because, however, Smith had been denied long-term–disability benefits by the plan administrator, he received no long-term–disability payments under the plan. His acceptance of employment at Target could not have prompted stoppage of any plan benefits. This highlighted provision of the plan is thus irrelevant to the issue of the propriety of court-ordered partial-disability payments.

For reasons articulated by the district court in its memorandum opinion, the defendants' other argument in support of its assertion that the partial-disability–benefits award was improper is also without merit. *See Smith*, 444 F. Supp.2d at 874-75. Although the relevant provision of the summary plan description

35

mentions that long-term disability benefits are available either "if you are partially disabled" *or* "if you . . . participate in a rehabilitation program," the language immediately following that provision which defines the amount to be paid for partial benefits assumes that the claimant participates in a company-approved rehabilitation program.[1] (JA 188) Consequently, as suggested by the defendants, the word "or" in the document provision actually means "and". Appellant br. at 40.

Nevertheless, Smith should not be penalized by the withholding of partial-disability benefits in this case simply because his Target position was not a pre-approved company rehabilitation program. Bayer had, prior to the plaintiff's employment with Target, made clear to him its position that it considered him physically, mentally, and emotionally able to return to work at his prior position.

[1]After stating that the plan provides benefits if one is partially disabled, the summary plan description further provides:

> *In these cases*, you will be paid full pay for time worked and receive an adjusted disability benefit. The amount of your adjusted benefit will be your net monthly income minus 50% of the income you receive from rehabilitative work.
>
> The rehabilitation program may provide physical therapy or retraining, or it may be a period of part-time work at your old job or a new position. Your rehabilitation program, whether formal or informal, must be approved in writing by the company medical representative and the claims administrator before it can be considered rehabilitative.

(JA 188) (Emphasis added.)

Consequently, any effort on the plaintiff's part to obtain approval for a rehabilitative position would have been futile. Because the defendants improperly denied Smith benefits under the plan, he was forced, in order to provide for himself and his family, to accept some remunerative employment. That act, occasioned by Bayer's own arbitrary and capricious decision, cannot now serve as the basis for the defendant's argument that further benefits are not due Smith. *See, e.g., Cook v. Liberty Life Assurance Co. of Boston*, 320 F.3d 11, 24-25 (1st Cir. 2003) ("It would be patently unfair to hold that an ERISA plaintiff has a continuing responsibility" to comply with all plan requirements and restrictions *after* denial of benefits "during the pendency of her internal appeals and litigation, on the off chance that she might prevail in her lawsuit.").

In *Cook*, the plan administrator had awarded benefits to the claimant because she was unable to perform any occupation. The plan administrator later requested updated medical information, which the claimant provided, and then terminated her benefits. The administrator argued that it did not need to award benefits past this termination date because the claimant had not provided any information as to her medical status after the termination of her benefits. The First Circuit held that the claimant was not under an obligation to provide this information once the plan administrator had arbitrarily and capriciously terminated her benefits. Despite the

37

lack of evidence in the administrative record as to her medical status after the termination of benefits, the First Circuit upheld the district court's award of benefits beyond the plan administrator's arbitrary and capricious termination.

Although *Cook*'s factual situation is not exactly the same as ours, its logic applies. In our situation, the plan administrator had arbitrarily and capriciously denied long-term–disability benefits to Smith under an "own occupation" standard. It would have been inapposite for Smith to ask the plan administrator to place him in a rehabilitative job when the plan was asserting that Smith could return to his former job as a pharmaceutical salesperson.

Although Bayer argues that there is no end in sight to such an award of partial-disability benefits, the plan does allow the claims administrator to ask a participant "to be examined by an independent doctor to verify [the participant's] *continuing* disability." JA 187 (emphasis added).

## CONCLUSION

After reviewing both "the quality and quantity of the medical evidence and the opinions on both sides of the issues," *Glenn*, 461 F.3d at 666, the district court correctly concluded that the decision of the plan administrator in this matter to deny

both long-term–disability benefits under the first-six-months standard as well as partial-disability benefits after Smith started working at Target was arbitrary and capricious. However, the district court did not consider the post–six-month definition of disability. Accordingly, we AFFIRM IN PART and VACATE IN PART the judgment of the district court and REMAND the issue whether Smith is due benefits during the time period that began after the first six months of long-term–disability benefits would have run and that ended when Smith started at Target.