OPINION OF THE COURT
JORDAN, Circuit Judge.
This is an appeal by the Evonik Degussa Corporation Administrative Committee (the “Committee”), Evonik Degussa Corporation Retirement Plan, and Evonik RohMax USA, Inc. Non-Qualified Pension Plan (together, the “Appellants”) of orders of the United States District Court for the Eastern District of Pennsylvania denying the Appellants’ motion for summary judgment and, ultimately, granting judgment for Robert Zebrowski, Robert Woodruff, and Gregory Bialy (together, the “Appel-lees”). According to the Appellants, the District Court erred in holding that an interpretation by the Committee of a benefits plan formulated under the “top hat” provision of the Employee Retirement Income Security Act of 1974 (“ERISA”), 29 U.S.C. § 1001 et seq., denied retirement benefits owed to the Appellees. We agree and will reverse the judgment of the District Court.
I. Background[1]
Appellees are former senior executives of Evonik RohMax USA, Inc. (“Evonik”) and its predecessors. All took early retirement. At issue is the calculation of their retirement benefits.
Evonik sponsors two retirement plans: (1) the Pension Plan, for most employees, and (2) the Supplemental Plan, for upper-level executives. The Pension Plan is a defined benefit pension benefit plan under ERISA, 29 U.S.C. § 1002(2), that provides a fixed amount of post-retirement benefits for all eligible employees. It is a “qualified” plan under section 401, et seq., of the Internal Revenue Code (the “Code”) because it complies with certain statutory requirements such as compensation limits. The Supplemental Plan is what is known as a “top hat plan,” a defined benefit pen *91 sion plan that does not require a limit on the amount of compensation that may be recognized.[2] Top hat plans are “unfunded and ... maintained by an employer primarily for the purpose of providing deferred compensation for a select group of management or highly compensated employees.” 29 U.S.C. § 1051(2). They are exempt from ERISA’s vesting, funding, and fiduciary requirements. Id. (vesting); id. at § 1081(a)(3) (funding); id. at § 1101(a)(1) (fiduciary exception).[3] The Appellees were enrolled in both the Pension Plan and the Supplemental Plan.
At a basic level, benefits under the Supplemental Plan are calculated according to the following formula: A-B, where A is the result of a specific formula for calculating benefits owed to an employee without Code contribution limits (“total retirement benefits,” according to the Appellants) and B equals “the pension benefit to which a Participant is entitled at his Early Retirement Date” plus any statutory benefits.[4] (J.A. at 221, 229.)
Under both the Pension Plan and the Supplemental Plan, participants may select from two payment options: monthly annuities or a lump sum payment. The Appel-lees chose to receive their benefits as lump sum payments. Before 2008, participants who chose monthly annuity payments under the plans received an annual 'cost of living adjustment (“COLA”), but those who selected lump sum payments did not. In 2007, however, the United States Court of Appeals for the Seventh Circuit, in Williams v. Rohm & Haas Pension Plan, held that providing COLA adjustments only to participants who selected monthly annuity payments, and not to those who selected lump sum payments, violates ERISA. 497 F.3d 710, 714 (7th Cir.2007). The court stated that, “[i]f a defined benefit pension plan entitles an annuitant to a COLA, it must also provide the COLA’s *92 actuarial equivalent to a. participant who chooses instead to receive his pension in the form of a one-time lump sum distribution.” Id. In response to Williams, the Committee amended the Pension Plan in 2008 to include COLAs for lump sum payments. It did not, however, amend the Supplemental Plan to include COLAs for lump sum payments because it believed the reasoning of Williams did not apply to the Supplemental Plan.[5]
The COLA amendment therefore raised the abstruse question of whether to include the COLAs for Pension Plan lump sum payments in Factor B (which reflects Pension Plan benefits) of the Supplemental Plan benefits formula (A-B) when there is no corresponding COLA included in Factor A and when a recipient chooses a lump sum payment. The Committee answered “yes” to that question and interpreted the Supplemental Plan to require the inclusion of COLAs in Factor B. In its review of the plan, the Committee determined that the total amount of retirement benefits promised to retirees would remain the same if the COLA were included in Factor B. According to the Committee, although benefits paid under the Supplemental Plan would decrease (under the A-B formula), Pension Plan benefits would increase by the same amount pursuant to the COLA. The Committee explained that, although the Supplemental Plan benefits were reduced by the amount of the COLA in Factor B, the total Pension Plan benefits were increased by the same amount, such that Appellees’ total retirement benefits (Pension Plan benefits + Supplemental Plan benefits) remained constant.[6]
On February 8, 2010, the Appellees filed a complaint in the United States District Court for the Eastern District of Pennsylvania, contending that “defendants incorrectly decided that the addition of COLAs to pension plan lump sums would reduce the corresponding top hat lump sums by the same amount.” (J.A. at 8 (summarizing the parties’ dispute).) The Committee then filed a counterclaim against Zebrow-ski for overpayments he allegedly received under the Supplemental Plan.[7] The Com *93 mittee moved to dismiss the complaint for failure to state a claim, and the motion was denied. The Committee then moved for summary judgment on both the complaint and the counterclaim, and the Appellees cross-moved for partial summary judgment on liability for pension benefits under ERISA, violations of ERISA’s anti-cutback rule, breach of fiduciary duties under ERISA, and “other appropriate equitable relief’ under ERISA. (Id. at 13.)
The District Court denied summary judgment to the Committee and granted the Appellees’ motion as to liability. The Court held that the Committee’s interpretation was not “reasonably consistent with the clear and unambiguous terms of the plans.” (Id. at 35.) It also concluded that the Committee had breached its fiduciary duties and that the Committee’s interpretation “constructively amended” the pension plan, such that, by including COLAs in Factor B, the Committee had reduced Pension Plan benefits in violation of ERISA’s anti-cutback rule. (Id. at 35-36.) Later, the District Court calculated prejudgment interest using the investment approach each Appellee was following in 2009, a tax gross-up based on the negative tax consequences to the Appellees, and attorney’s fees. A final and appealable Amended Order and Judgment was entered on December 4, 2012. This timely appeal followed.
II. Discussion[8]
The District Court did not apply the rule for top hat plans set forth in our decision in Goldstein v. Johnson & Johnson, 251 F.3d 433, 441-44, 448 (3d Cir.2001). Under Goldstein, a plan administrator’s interpretations of ambiguous terms are given deference, subject to the covenant of good faith and fair dealing, if the plan in question includes a grant of discretionary authority. See id. at 442-44. The District Court held that the plan terms here were unambiguous and so it did not apply the Goldstein standard of deference to the Committee’s interpretation.[9] That was error, since there is both ambiguity and a grant of discretionary authority in the Supplemental Plan.
A. Ambiguous Contract Terms
Top hat plans are contracts “governed by general principles of federal common law.” In re New Valley Corp., 89 F.3d 143, 149, 150-51 (3d Cir.1996) (holding that top hat plans are unilateral contracts); see also Kemmerer v. ICI Americas Inc., 70 F.3d 281, 287 (3d Cir.1995) (noting that top hat plans are governed by “breach of contract principles, applied as a matter of *94 federal common law”). If contract terms “are capable of more than one objectively reasonable interpretation, the words are ambiguous.” Baldwin v. Univ. of Pittsburg Med. Ctr., 636 F.3d 69, 76 (3d Cir.2011).
In determining whether there is ambiguity, “[t]he strongest objective manifestation of intent is the language of the contract.” Id. (citing Mellon Bank, N.A. v. Aetna Bus. Credit Inc., 619 F.2d 1001, 1009 (3d Cir.1980)) (finding ambiguity in pension plan term “children”). The District Court determined that the language dealing with Factor B “unambiguously and unmistakably refers to the [Pjension [P]lan” and, therefore, incorporates Article VI of the Pension Plan. (J.A. at 33.) According to the District Court, Article 6.1 provides a formula to calculate Pension Plan benefits that produces an annuity for Factor B which would not include the annual COLA. Even if the District Court’s reading of Article 6.1 of the Pension Plan were correct — and we make no comment on that reading — we disagree that Article 6.1 is plainly incorporated into the “Factor B ” formula of the Supplemental Plan.
On the contrary, it is far from plain how, if at all, Article 6.1 affects the calculation of Factor B. Throughout the rest of the Supplemental Plan, when the drafters intended to incorporate a term from the Pension Plan, the section or article number of the Pension Plan was included with its capitalized title. For example:
2.11. “Benefit Service ” means that part of a Participant’s Service that is used to calculate benefits under the Plan and shall be determined in accordance with the provisions of ARTICLE III— SERVICE CREDIT of the Pension Plan and Article XIII of this Plan.
(Id. at 221.)
Supplemental Plan sections 2.36, 2.37, 13.2, and Article IV contain the same format for references to the Pension Plan. That format was not used in the “Factor B” language to reference terms of the Pension Plan. In fact, Factor B does not mention how Pension Plan benefits are to be calculated at all, let alone whether a COLA should be included. Because one can make a reasoned argument for both the District Court’s reading and for the different reading given by the Committee, the pertinent provisions of the Supplemental Plan are, by definition, ambiguous. The District Court thus erred when it reached the contrary conclusion.
B. Grant of Discretion
We have “routinely treated top hat plans differently from other kinds of plans.” Goldstein, 251 F.3d at 436. They are considered to be “unilateral contracts, whereby neither party’s interpretation is entitled to any more ‘deference.’ ” Id. Under ordinary contract principles, however, we give full effect to any provisions in a top hat plan that grant a plan administrator discretion to interpret ambiguous plan terms. Id. The administrator’s interpretation is in all events subject to “de novo review as to whether a party has complied with its good-faith obligations.” Id. at 444.
The “broad” grant of discretion in the top hat plan at issue in Goldstein gave the administrator “ ‘sole authority’ to ‘[interpret the provisions’ of the plan.” Id. at 436. The Supplemental Plan at issue here grants a similar degree of discretion to the Committee. Article XV of the 1999 Supplemental Plan, at section 15.2.3, gives the Committee the authority to “[i]nterpret[ ] the provisions of the Plan in all particulars.” (J.A. at 240.) Even if, as the Ap-pellees argue, the 1999 version of the plan — not the 2008 version — is applied, the language of the 1999 Supplemental Plan is *95 sufficient to establish the Committee’s discretionary authority.[10]
Therefore, “the question presented to the Court is not whether [the Committee’s] interpretation offers the best reading of the contract; rather, given the discretion granted to the [Committee], the question is whether the interpretation offered by [the Committee] was reached in good faith.” Goldstein, 251 F.3d at 445. The District Court, in fact, concluded that the Committee did not act in bad faith, at least regarding the imposition of prejudgment interest. (J.A. at 46 (“[T]he record does not convincingly evince intentional bad faith or ill-motive on defendants’ part.”).) That factual determination is supported by the record, and there is no reason to believe there was anything less than good faith with respect to other aspects of the Committee’s interpretive work or that the Committee did not “exercise [its] discretion reasonably.” Goldstein, 251 F.3d at 444.
The dissent, on the other hand, concludes that the Committee’s interpretation was unreasonable. (Dissent Op. at 103-04.) Our colleague’s discussion of reasonableness, however, is flawed because it dismisses the attendant change in the law — ie., the Williams decision — that prompted the Committee’s interpretation. Nor do we find persuasive an argument that the existence of other possible interpretations renders the Committee’s decision unreasonable. That is a non sequitur. The dissent reviews reasonableness as if the Committee arbitrarily decided in 2008 to change the Supplemental Plan calculations. The Committee’s interpretation of how the Supplemental Plan benefits were to be calculated, however, was based on the Pension Plan amendment, prompted by Williams[11], and the attendant complexity of the lump sum calculations. While the dissent’s review of the record highlights the ambiguity of the contract here, that does not make the Committee’s interpretation unreasonable.[12]
*96 The record establishes that the Committee reached a reasonable interpretation of the Supplemental Plan, given the contract’s inherent ambiguity and the calculations necessary under complex pension plans such as those before us. There is nothing unreasonable about one interpretation over the other when the plan is “reasonably susceptible” to either meaning put forth by the parties. Goldstein, 251 F.3d at 447. As in Goldstein, we have looked to the Committee’s substantive interpretation of the plan and conclude that there was “no inherent unreasonableness in the substantive interpretation” that would give rise to an “inference of bias or bad faith.” Id.
We will accordingly reverse the District Court’s order granting summary judgment to the Appellees because the terms of the Supplemental Plan are ambiguous and so are subject to the Committee’s good faith interpretation.[13]
C. Breach of ERISA’s Fiduciary and Anti-Cutback Provisions
The Appellants also contend that the District Court erred in concluding both that the Committee breached its fiduciary duties and that the Committee had illegally decreased the Appellees’ accrued benefits under ERISA Section 204(g). According to the Appellants, those claims have no place in this dispute over a top hat plan. They also argue that the District Court’s reliance on Battoni v. IBEW Local Union No. 102 Employee Pension Plan, 594 F.3d 230 (3d Cir.2010), was mistaken.
As a general matter, the administration and interpretation of an ERISA plan are “fiduciary acts.” Varity Corp. v. Howe, 516 U.S. 489, 502-03, 116 S.Ct. 1065, 134 L.Ed.2d 130 (1996). However, “it is well *97 established ... that there is no cause of action for breach of fiduciary duty involving a top hat plan.” Goldstein, 251 F.3d at 443. ERISA also contains an anti-cutback provision, pursuant to which “[t]he accrued benefit of a participant under a plan may not be decreased by an amendment of the plan, other than an amendment described in section 1082(d)(2) or 1441.” 29 U.S.C. § 1054(g)(1). But top hat plans are exempt from ERISA’s substantive vesting rules, including the anti-cutback provision. See 29 U.S.C. §§ 1051(2), 1101(a)(1); Miller v. Eichleay Eng’rs, Inc., 886 F.2d 30, 34 n. 8 (3d Cir.1989). Appellees nevertheless rely on Battoni and contend that the ordinary fiduciary duty and anti-cutback rules apply because the plans at issue in this case are so interconnected that the Committee’s interpretation of the Supplemental Plan was an amendment that effectively reduced benefits under the Pension Plan.
The District Court rejected the Appellants’ argument that the plans are separate because it believed that the Committee “gave with one hand” and “took away with the other” when it increased Pension Plan lump sum payments by the COLA but decreased Supplemental Plan lump sum payments by the same amount. (J.A. at 36.) We disagree. First, and foremost, our analysis hinges on whether the two plans are, as the Appellants argue, two separate plans, or are so intertwined that, as the Appellees say, the statutory protections of ERISA should apply when ordinarily they would not. Looking at the terms of the plans themselves and the separate provisions under ERISA that apply to each plan, we conclude that the plans are indeed separate and distinct. As discussed above, the instances where the Supplemental Plan incorporates the Pension Plan are clearly defined in a way that indicates the drafters’ intent not to entirely read one plan into the other. Moreover, if we were to hold as the District Court did, ERISA’s specific top hat rules would be substantially undermined because statutory provisions pertaining to regular pension plans could regularly be read into top hat plans, contrary to Congress’s intent to provide fewer protections for top hat beneficiaries. See Department of Labor Office of Pension & Welfare Benefit Programs, Opinion 90-14A, 1990 WL 123933, at *1 (May 8, 1990) (Department of Labor opinion noting that certain employees have the ability to negotiate their benefit plans and, as such, do not need more substantive protections); see also Goldstein, 251 F.3d at 442 (citing Department of Labor opinion).
Nor do we think Battoni is applicable here. Again, ERISA’s anti-cutback and fiduciary provisions do not apply to top hat plans. 29 U.S.C. §§ 1051(2), 1101(a)(1). Because the plans are separate, the Committee’s interpretation of the Supplemental Plan, which is a top hat plan, does not effect a cutback of the Pension Plan. Even if Battoni were relevant, however, it would not aid the Appellees. That case requires a party making an anti-cutback claim to “show (1) that a plan was amended, and (2) that the amendment decreased an accrued benefit.” Battoni, 594 F.3d at 233. The Appellees cannot establish either of those elements. There was no “amendment,” either constructive or otherwise, when the Committee interpreted the plan, and the Appellees’ benefits were not decreased because they received the COLA owed to them under the Pension Plan. In short, there was no cutback.
III. Conclusion
For the foregoing reasons, we will reverse the judgment of the District Court.

. We are faced with a combination of complex benefits schemes and the following recitation of the facts reflects the level of simplification that the parties, mercifully, provided to us in their briefing.

. Top hat plans allow executives with salaries above the compensation limit to ensure retirement income that is closer to their pre-retirement income. They permit an employee to defer some compensation until retirement, when the employee may be in a lower tax bracket. See In re IT Grp., Inc., 448 F.3d 661, 664-65 (3d Cir.2006) (discussing top hat plans under ERISA).

. Top hat plans are subject to ERISA’s reporting and disclosure provisions, as well as its administration and enforcement requirements. 29 U.S.C §§ 1021-1045.

. The Supplemental Plan states:
The Basic Amount of Early Retirement Pension of a Participant who retires from the Company ... shall be one-twelfth of (AB)xC:
• A equals 1.5% of the sum of the Participant’s Basic Earnings Rate and his Award Program Adjustment, minus 0.35% of the Participant’s Final Average Compensation; multiplied by the number of completed years and any fractional parts thereof of Benefit Service up to a maximum of 44 years. This amount shall be calculated without application of Section 415 or Section 401(a)(17) of the Code;
• B equals the ... Basic Amount of [Early] Retirement Pension Benefits to which the Participant is entitled from the Pension Plan plus any' Statutory Benefits to which the Employee may be entitled; and
• C equals the percentage (not to exceed 1.0) determined by dividing the number of months in the 10 year period preceding the Determination Date that the Participant was an executive career band level or greater by 60.
(J.A. at 229.)
Here, there is no dispute that factor C equals one for all Appellees, as they were all fully vested. The District Court, however, stated that the Committee’s interpretation of Factor A as a "total retirement benefit” was "not supported by a plain reading of the plans.” (J.A. at 32.) The District Court defined Factor A as "an annuity amount for all regular and bonus compensation without application of Internal Revenue Code Requirements for tax-qualified pension plans.” (J.A. at 31-32.)

. Under the 1999 Supplemental Plan, the Committee is responsible for “[ijnterpreting the provisions of the Plan in all particulars.” (J.A. at 240.) The Supplemental Plan was amended in December 2008 to be retroactively effective as of January 1, 2005 ("2008 Supplemental Plan”) to include a stronger grant of discretionary authority to the Committee.

. Our dissenting colleague takes issue with the Committee’s interpretation because Appel-lees' benefits remained the same after a COLA was added, saying, "there is no perceived or actual benefit to Appellees as a result of the COLA Amendment under this scenario.” (Dissent Op. at 100 n. 6.) The dissent further asks "[w]hy would Appellees contract for such an illusory COLA benefit?” (Id. at 100.) These comments indicate a misunderstanding about the nature of the benefit plans at issue. The Appellees in fact did receive the benefit of the COLA under the Pension Plan. The fact that the Supplemental Plan is calculated in such a way that it decreases if the Pension Plan increases is the result of contract language. The Appellees never contracted for a COLA increase under the Supplemental Plan because a lump sum payment under the Supplemental Plan has never included a COLA adjustment. (J.A. at 234 (The 1999 plan stating that for "[a] lump sum payment which is the Actuarial Equivalent of the Participant’s Retirement Income expressed as a life annuity ... the cost-of-living benefit described in Article XI is not available.”); J.A. at 277 (The 2005 plan COLA section, Section 9, stating ”[n]o cost-of-living adjustment shall be provided under this Section with respect to any benefit paid in the lump sum form.”).)

.Zebrowski retired in 2006, before the Pension Plan COLA amendment, but the amendment was applied retroactively to allow COLAs for lump sum benefits earned before December 2008, so Zebrowski was entitled to additional payments for past Pension Plan COLAs. On February 27, 2009, Evonik sent Zebrowski a letter stating that he had re *93 ceived a Supplemental Plan overpayment in the same amount as his Pension Plan COLA increase under the Committee's interpretation of the Supplemental Plan. In addition, there were certain tax consequences based on the payments, and Zebrowski was given two options to manage the tax issues. He refused both options and submitted an administrative benefit claim. His claim was denied, and he filed suit.

. The District Court had jurisdiction under 28 U.S.C. §§ 1331 and 1332. We have jurisdiction pursuant to 28 U.S.C. § 1291. "We exercise plenary review of summary judgment and we apply the same standard that the lower court should have applied.” Farrell v. Planters Lifesavers Co., 206 F.3d 271, 278 (3d Cir.2000). "Summary judgment is appropriate if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. In making this determination, we must consider the evidence in the record in the light most favorable to the nonmoving party.” Smith v. City of Allentown, 589 F.3d 684, 689 (3d Cir.2009) (citations omitted) (internal quotation marks omitted).

. The District Court referenced Goldstein and the standard of review, but rested its analysis on its interpretation of the contract terms, which it held to be unambiguous. It appears that, in light of that holding, the Court determined that Goldstein was inapplicable.

. We also disagree with the District Court’s analysis regarding the vesting of benefits under the Supplemental Plan and its assertion that the Committee’s argument regarding its discretion to interpret the plan was a "claim of discretion to nullify plaintiffs’ entitlement to benefits” (J.A. at 29) that ”reserve[d] a right to amend or terminate benefits after a participant's performance” (J.A. at 30). The interpretation at issue does not address vesting benefits under the Supplemental Plan; it addresses only the relative distribution of those vested benefits between the Supplemental Plan and the Pension Plan, i.e., what the result of the formula A-B is. Accordingly, the Committee's determination that COLAs are included in Pension Plan benefits under Factor B is not a decision to terminate vested Supplemental Plan benefits.

. The Dissent attempts to diminish the import of the Williams decision, but a Committee overseeing a federally regulated benefits plan should not be faulted for paying attention to the decision of a federal circuit court.

.The dissent relies on select examples of the Committee’s "course of dealing” to come to the conclusion that the Committee’s interpretation is unreasonable. (Dissent Op. at 100.) But none of the record citations seems to us to be the "writing ... on the wall” that the dissent believes them to be. (Id. at 103-04.) For the sake of completeness, however, we will review each here. First, the dissent highlights testimony that it claims confirms that "there was no ... intent ... to treat Supplemental Plan beneficiaries differently based on their elections ... under the Pension Plan.” (Id. at 101) That seems to be a red herring. Under the terms of the Supplemental Plan, an annuity always allowed for a COLA. Thus, there was no conflict between the two plans because they both provided COLAs for annuity payments and so in fact treated beneficiaries the same. Second, the dissent quotes an actuary employed until 2006, who was not at the company when the Williams decision came out or when the COLA Amendment was passed. Despite emphasizing the importance of credibility determinations (id. at 98-99 n. 3), the dissent relies on testimony of an em *96 ployee — not referenced by the District Court itself — who was not present for the determinations relevant here. In response to this point, the Dissent notes that the next actuary testified that the Committee’s interpretation was new. But the new interpretation of ambiguous contract language here, based on changed circumstances, is no smoking gun. Third, the dissent claims that internal resolutions show that the Committee changed its understanding of the Supplemental Plan. The dissent emphasizes that, in a resolution dated December 19, 2007, "the Committee wrote: ‘[n]on-qualified [Supplemental] plan benefits are reduced by qualified [Pension] plan benefits, but are not linked to elections under the qualified [Pension] plan.' " (Id. at 102 (quoting App. at 1550).) The dissent, however, could veiy well have emphasized the first half of the resolution, "[n]on-qualified [Supplemental] plan benefits are reduced by qualified [Pension] plan benefits,” to make a very different point. It is reasonable to read the December 2007 resolution, as we do, as affirming that the formula A-B does not change based on a Pension Plan election. We do not think it is an "about-face” (id. at 102-03) to go from the simple statement that Supplemental Plan benefits are reduced by Pension Plan benefits, to the added language of Factor B that the Supplemental Plan benefits "shall reflect the relative value of the Participant’s selected payment form under the Pension Plan.” (Id. (quoting App. at 266).) These statements simply address the contours of the formula under which benefits are calculated.
As to the assertion that the contract language does not support the Committee’s interpretation, the dissent cites to the deposition of the Director of Human Resources who testified that ”[o]bviously, there was an interpretation of the plan which was contrary to the way some of us thought the plan should be interpreted.” (J.A. at 1871 (emphasis added).) An internal dispute over contract terms — that we have already determined are ambiguous — does not indicate that the interpretation finally arrived at is unreasonable.

. The District Court’s ruling on Appellants' counterclaim against Zebrowski and the award of prejudgment interest and a tax gross up for Appellees are foreclosed by our determination that the District Court erred in finding that the Committee impermissibly denied benefits owed under ERISA. Thus, they too are reversed, consistent with this opinion.