Patrice A. DELANEY, Plaintiff,

v.

The PRUDENTIAL INSURANCE COMPANY OF AMERICA, Defendant.

No. 3:13–cv–01761–ST.

United States District Court, D. Oregon, Portland Division.

Signed Dec. 12, 2014.

John C. Shaw, Megan E. Glor, Megan E. Glor, Attorneys at Law PC, Portland, OR, for Plaintiff.

Amanda A. Sonneborn, James C. Goodfellow, Jr., Seyfarth Shaw LLP, Chicago, IL, Diane L. Polscer, Andrew S. Moses, Gordon & Polscer, LLC, Portland, OR, for Defendant.

**1218**

## OPINION AND ORDER

MOSMAN, District Judge.

On November 17, 2014, Magistrate Judge Stewart issued her Findings and Recommendations ("F & R") [39], recommending that Defendant's Motion for Summary Judgment [25] be DENIED and Plaintiff's Motion for Judgment on the Pleading [26] should be GRANTED IN PART and DENIED IN PART. No objections to the F & R were filed.

## DISCUSSION

■ The magistrate judge makes only recommendations to the court, to which any party may file written objections. The court is not bound by the recommendations of the magistrate judge, but retains responsibility for making the final determination. The court is generally required to make a *de novo* determination regarding those portions of the report or specified findings or recommendation as to which an objection is made. 28 U.S.C. § 636(b)(1)(C). However, the court is not required to review, *de novo* or under any other standard, the factual or legal conclusions of the magistrate judge as to those portions of the F & R to which no objections are addressed. *See Thomas v. Arn,* 474 U.S. 140, 149, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *United States v. Reyna–Tapia,* 328 F.3d 1114, 1121 (9th Cir. 2003). While the level of scrutiny under which I am required to review the F & R depends on whether or not objections have been filed, in either case, I am free to accept, reject, or modify any part of the F & R. 28 U.S.C. § 636(b)(1)(C).

Upon review, I agree with Judge Stewart's recommendation and I ADOPT the F & R [39] as my own opinion. IT IS SO ORDERED.

## FINDINGS AND RECOMMENDATIONS

STEWART, United States Magistrate Judge:

### *INTRODUCTION*

Plaintiff, Patrice A. Delaney ("Delaney"), is a former employee of Jeld–Wen Holding, Inc. ("Jeld–Wen"), and was a participant in an employee benefits plan ("Plan") sponsored by Jeld–Wen that offered long-term disability ("LTD") benefits to eligible employees. Delaney filed this action on October 3, 2013, alleging that the Plan's Claims Administrator, Prudential Insurance Company of America ("Prudential"), violated the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1132(a)(1)(B), by denying her application for LTD benefits. This court has jurisdiction over this case under 28 U.S.C. § 1331 and § 1132(e)(1).

The parties have filed cross-motions for judgment under FRCP 52 or, alternatively, for summary judgment pursuant to FRCP 56. For the reasons that follow, Prudential's Motion (docket # 25) should be denied, and Delaney's Cross–Motion (docket # 26) should be granted for a declaratory judgment that she has satisfied her burden of proof under both the "regular occupation" and the "any gainful occupation" standards of Prudential's policy and an award of her LTD benefits from June 20, 2012, through the date of judgment, but otherwise should be denied with leave to renew her request for prejudgment interest at the Oregon statutory rate.

### *STANDARD OF REVIEW*

■ Initially this court must determine the applicable standard of review. In the Ninth Circuit, "unless plan documents unambiguously say in sum or substance that the Plan Administrator or fiduciary has authority, power, or discretion to deter-

mine eligibility or to construe the terms of the plan, the standard of review will be *de novo.*" *Sandy v. Reliance Standard Life Ins. Co.,* 222 F.3d 1202, 1207 (9th Cir. 2000). Otherwise, the standard of review is for abuse of discretion.

## I. *Plan Terms*

Jeld–Wen is the Contract Holder, Plan Sponsor and Plan Administrator, as those terms are defined in ERISA. AR 22, 64.[1] Prudential is the Claims Administrator. AR 65.

In connection with the Plan, Jeld–Wen entered into a Group Insurance Contract with Prudential, Group Contract No. G–50278–OR ("Group Contract" or "Plan"). AR 1–17. The Group Contract provides that "if the provisions of the Group Contract do not conform to the requirements of any state or federal law or regulation that applies to the Group Contract, the Group Contract is automatically changed to conform with Prudential's interpretation of the requirements of that law or regulation." AR 8. Pursuant to that Group Contract, Prudential issued to Jeld–Wen a Certificate of Insurance ("Certificate") which sets forth the terms and conditions governing determinations of claims for benefits and appeals of adverse determinations. AR 18–62. Jeld–Wen also issued a Summary Plan Description ("SPD"). AR 63–69. LTD benefits under the Plan are insured and paid by Prudential. AR 1–17, 64.

The Certificate defines a participant as "disabled when Prudential determines that you are unable to perform the *material and substantial duties* of your *regular occupation* ...." AR 31. After the first 24 months of payments, a participant is "disabled when Prudential determines that due to the same sickness or injury: ... you are unable to perform the duties of any *gainful occupation* ...." *Id.* The Certificate further states that "Prudential will assess your ability to work and the extent to which you are able to work...." *Id.* In making that assessment, Prudential is permitted to require a participant "to be examined by doctors, other medical practitioners or vocational experts ... as often as it is reasonable to do so" and "to be interviewed by an authorized Prudential Representative." *Id.*

Benefit payments begin only after a 90–day elimination period of "continuous disability." AR 33. To obtain benefits, a participant "must send Prudential written proof of your claim no later than 90 days after your elimination period ends" and, for a LTD claim, Prudential "may request that you send proof of continuing disability, satisfactory to Prudential...." AR 54. The Certificate further requires a participant:

> to give Prudential authorization to obtain additional medical information, and to provide non-medical information as part of your proof of claim, or proof of continuing disability.... Prudential will deny your claim or stop sending you payments if the appropriate information is not submitted.

*Id.*

Benefit payments cease when, among other things, a participant is "no longer disabled" or "fail[s] to submit proof of continuing disability satisfactory to Prudential." AR 46.

The SPD provides that Prudential:

> as claims administrator has the sole discretion to interpret the terms of the Group Contract, to make factual findings, and to determine eligibility for benefits. The decision of the Claims

1. Citations are to the page number of the Administrative Record ("AR"), filed as the Stipulated Record for Review (docket # 19) on April 24, 2014.

Administrator shall not be overturned unless arbitrary and capricious.

AR 65.

The SPD also states that Prudential: (1) "shall notify you of the claim determination within 45 days of the receipt of your claim;" (2) send written notice of a denial of a claim; and (3) "make a determination of your claim appeal" and "second claim appeal" and issue written denials. AR 65–67.

## II. *Analysis*

 Prudential contends that it has discretionary authority to interpret the Plan based primarily on language in the SPD which it contends is part of the Plan. However, "information *about* the plan provided by [the required] disclosures [in SPDs] is not itself *part of* the plan." *CIGNA Corp. v. Amara*, 563 U.S. 421, 131 S.Ct. 1866, 1877, 179 L.Ed.2d 843 (2011). Here the SPD expressly states that it "is not part of the Group Insurance Certificate," and the list of documents comprising the Plan does not include the SPD. AR 16, 63. Thus, the language in the SPD to the effect that Prudential has "sole discretion to interpret the terms of the Group Contract" (AR 65) provides no support for Prudential's argument that it has discretionary authority to interpret the Plan.

 As further evidence of its discretionary authority to interpret Plan terms, Prudential points to language in the Group Contract which automatically changes the Group Contract to "conform with Prudential's interpretation" of any applicable state or federal law or regulation. AR 8. However, that provision merely sets out a method for ensuring that provisions in the Group Contract do not run afoul of applicable laws or regulations. It is not an unambiguous grant of discretionary authority to Prudential to interpret Plan terms, except perhaps to the extent the terms of the Group Contract conflict with

federal or state statutes or regulations. No such conflict has even been identified, much less underlie Delaney's claim in this case.

 As additional evidence of its discretionary authority, Prudential relies on other language in the Certificate stating that: (1) receipt of benefits is contingent upon the participant submitting proof of continuing disability that is "satisfactory to Prudential" (AR 40, 54); and (2) a participant is eligible for benefits only "when Prudential determines" (AR 31) that the claimant is disabled.

In support, Prudential relies on *Prezioso v. Prudential Ins. Co. of Am.*, 748 F.3d 797 (8th Cir.2014), which interpreted virtually identical language in a LTD Plan to reject the *de novo* review standard. One provision stated that "in considering a claim for LTD benefits, Prudential 'may request . . . proof of continuing disability, satisfactory to Prudential,'" and another provision stated that "benefits, if granted, will cease on the date 'you fail to submit proof of continuing disability satisfactory to Prudential.'" *Id.* at 803. The Eighth Circuit held that this "plan language as confirmed by the SPD explicitly granted Prudential discretion to interpret the plan and to determine eligibility for benefits." *Id.* In reaching this conclusion, *Prezioso* declined to follow the contrary decision of the Fourth Circuit in *Cosey v. Prudential Ins. Co. of Am.*, 735 F.3d 161, 166–68 & n. 3 (4th Cir.2013), and cases it cites. In contrast to the Eighth Circuit, the Fourth Circuit in *Cosey* rejected the notion that language-requiring "proof satisfactory to the plan administrator" could insulate an insurer from *de novo* review:

We observe that five of our sister circuits recently have held that language does not unambiguously confer such discretionary authority. In fact, earlier this year, the First Circuit followed the

Seventh Circuit's example in departing from its own precedent to join a growing consensus of circuit courts that require stricter clarity in plan language before insulating insurance companies from full judicial review.

*Cosey*, 735 F.3d at 166 (citations omitted).

Among the five sister circuits followed by *Cosey* is the Ninth Circuit which held that policy language stating that proof of a disability claim " 'must be satisfactory to Sun Life' " was insufficient to confer discretion on the plan administrator. *Feibusch v. Integrated Device Tech., Inc. Emp. Benefit Plan*, 463 F.3d 880, 883–84 (9th Cir.2006). By reaching a contrary conclusion to *Cosey*, *Prezioso* directly conflicts with controlling authority in this circuit.

■ According to the Ninth Circuit, insurers wishing to cloak themselves with discretionary authority must unambiguously do so. Patching together various phrases from various documents, none of which come right out and grant such discretionary authority, is insufficient, as is relying on a provision which is not expressly incorporated into the plan terms. Instead, the insurer must go to the minimal effort of making clear its exact scope of authority:

> We think it appropriate to insist . . . that the text of a plan be unambiguous. If an insurance company seeking to sell and administer an ERISA plan wants to have discretion in making claims decisions, it should say so. It is not difficult to write, "The plan administrator has discretionary authority to grant or deny benefits under this plan." When the language of a plan is unambiguous, a company purchasing the plan, and employees evaluating what their employer has purchased on their behalf, can clearly understand the scope of the authority the administrator has reserved for itself. [I]t is "easy enough" to confer discretion unambiguously "if plan sponsors, admin-

istrator, or fiduciaries want benefits decisions to be reviewed for abuse of discretion." Where they fail to do so, "in this circuit at least, they should expect *de novo* review."

*Ingram v. Martin Marietta Long Term Disability Income Plan*, 244 F.3d 1109, 1113–14 (9th Cir.2001), quoting *Sandy*, 222 F.3d at 1206.

Nothing identified by Prudential is sufficient to apply the abuse of discretion standard in this case Thus, review of Prudential's claim decision should proceed under a *de novo* standard of review.

### *PROCEDURAL POSTURE*

This case comes before this court on cross-motions for either judgment under FRCP 52 or, alternatively, for summary judgment under FRCP 56. Where, as here, the court reviews the record *de novo*, "a trial on the administrative record, which permits the court to make factual findings, evaluate credibility, and weigh evidence, appears to be the appropriate proceeding to resolve the dispute." *Rabbat v. Standard Ins. Co.*, 894 F.Supp.2d 1311, 1314 (D.Or.2012) (citations omitted).

■ Because this matter is subject to *de novo* review, Delaney bears the burden of proof. *Muniz v. Amec Const. Mgmt., Inc.*, 623 F.3d 1290, 1294 (9th Cir. 2010). To meet her burden, Delaney must establish "by a preponderance of the evidence, that [she] was disabled under the terms of the Plan during the claim period." *Joy v. AGC–Int'l Union of Operating Eng'rs Local 701 Defined Pension Benefit Plan*, No. 3:11–cv–00743–PK, 2012 WL 2576213, at \*8 (D.Or. Apr. 24, 2012), quoting *Oster v. Standard Ins. Co.*, 759 F.Supp.2d 1172, 1185 (N.D.Cal.2011). To do so, she must "simply [persuade] the trier of fact . . . that the existence of a fact is more probable than its nonexistence." *Concrete Pipe & Prods. of Cal., Inc. v.*

*Construction Laborers Pension Trust for S. Cal.,* 508 U.S. 602, 622, 113 S.Ct. 2264, 124 L.Ed.2d 539 (1993), quoting *In re Winship,* 397 U.S. 358, 371–72, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970) (Harlan, J., concurring). "Unlike other standards of proof ... the preponderance standard allows both parties to share the risk of error in roughly equal fashion, except that when the evidence is evenly balanced, the party with the burden of persuasion must lose." *Metro. Stevedore Co. v. Rambo,* 521 U.S. 121, 137 n. 9, 117 S.Ct. 1953, 138 L.Ed.2d 327 (1997) (internal quotation marks, brackets, and citation omitted).

## FINDINGS OF FACT

### I. *Delaney's Job at Jeld–Wen*

Delaney worked 18 years for Jeld–Wen from November 1993 until March 21, 2012. AR 115. Her "regular occupation" as an escrow officer required her to complete "very time sensitive complex real estate escrow transactions." AR 122, 198–99. Delaney's job also required cognitive skills such as analytical reasoning, interpersonal skills, math and computer skills, and communication skills including making personal, email, and telephone contact with clients. AR 122–244, 198–99. Physically, the escrow officer job is classified as sedentary and does not require lifting or carrying items weighing more than 10 pounds, pushing, pulling, climbing, balancing, stooping, kneeling, crouching, crawling, fine manipulation or firm grasping, use of lower extremities for foot controls, or exposure to extreme weather or environmental conditions. AR 119–20.

### II. *Plan Terms*

Under the terms of the Plan, Delaney is "disabled" if she is "unable to perform the material and substantial duties of [her]

regular occupation due to [her] sickness or injury; and [she is] under the regular care of a doctor; and [she has] a 20% or more loss in [her] monthly earnings due to that sickness or injury." AR 31. After 24 months, Delaney is "disabled" under the terms of the Plan when, "due to the same sickness or injury, [she is] unable to perform the duties of any gainful occupation for which [she is] reasonably fitted by education, training or experience; and [she is] under the regular care of a doctor." *Id.*

Material and substantial duties are defined as those "normally required for the performance of your regular occupation and cannot be reasonably omitted or modified." *Id.* Regular occupation means "the occupation you are routinely performing when your disability begins" and "as it is normally performed instead of how the work tasks are performed for a specific employer or a specific location." *Id.* Gainful occupation means "an occupation, including self-employment, that is or can be expected to provide you with an income within 12 months of your return to work, that exceeds 60% of your indexed monthly earnings, if you are working; or 60% of your monthly earnings, if you are not working." AR 32.

### III. *Medical Evidence*

Delaney's primary care physician, Maria Czarnecki, M.D., noted that Delaney was diagnosed in 2010 with Meniere's disease in her left ear. AR 155, 166; *see also* AR 202. Delaney had been treating with an otolaryngologist, Dr. Proctor, who prescribed Dyazide, as well as Meclizine and Valium "for acute dizziness." AR 166.[2] However, by late June 2011, her Meniere's episodes were increasing in frequency and

---

**2.** Dr. Proctor's chart notes are not in the record, but references to them are found in

Dr. Czarnecki's chart notes.

severity. AR 166 ("She has had at least 4 episodes of Meniere's over the last couple of weeks and it is starting to feel somewhat debilitating especially when she vomits."). Dr. Czarnecki referred Delaney to R. Sterling Hodgson, M.D., a neurotologist who "limits his practice to the diagnosis and management of disorders that affect the ear, its surrounding structures, and their relationship to the brain." AR 263; http://www.hodgsonmd.com/faq.php (last visited Oct. 16, 2014).

At her initial appointment with Dr. Hodgson on August 10, 2011, Delaney reported both her history with Meniere's and her current symptoms as follows:

> She woke up with hearing loss and tinnitus in her left ear in April 2010. Within a few days she had intense spinning vertigo, nausea and vomiting, aggravated by movement and difficulty walking, which lasted about 3–4 days. She slowly improved. She's had plugging and hearing loss in the left ear ever since, with persistent tinnitus. The tinnitus fluctuates in pitch and volume, but she doesn't feel there's any fluctuation in hearing.... She's had episodic vertigo ever since. She gets sudden onset of spells, which start with a hot flash and diaphoresis, then sudden and severe spinning, nausea and vomiting. She can't stand, has to stagger or crawl, has about an hour of intense symptoms. She will take meclizine and Valium as needed, and then sleeps for 4–6 hours before she feels better. However, it takes her several days to fully recover, with some mild imbalance and sensitivity to movement. She also has more sensitivity to sound in her left ear after an attack for about a week. She's had five attacks in the last seven months.

AR 168.

Dr. Hodgson noted a "flat mild hearing loss in her left ear," diagnosed Delaney with left side Meniere's disease, and pre-scribed Klonopin wafers "to try as needed for attacks, to see if this has any quicker onset or better control of her vertigo." AR 168.

At another appointment on October 12, 2011, Delaney's hearing loss was "currently worse after her last episode a week ago," and she was having "clusters" of Meniere's episodes, "at one point having 4 episodes in 5 days." AR 179. The episodes caused Delaney to be "quite vertiginous for at least 20–30 minutes and sleepy for several hours, followed by a day or two of recovery." *Id.*

Her Meniere's episodes continued to increase in frequency and severity to the point that by March 22, 2012, the day after she stopped working, she reported 19 episodes in the past month. AR 189. Due to what Dr. Hodgson described as "progressive and intractable" Meniere's disease, Delaney elected to undergo left endolymphatic shunt surgery on March 22, 2012, despite the "potential risks of hearing loss, aggravation of vertigo, tinnitus, facial weakness or [cerebrospinal fluid] leak as well as infection." AR 189–91.

Delaney experienced improvement for a week or two after that surgery, but by April 30, 2012, reported 10 episodes in the preceding month "similar in intensity to her pre-op spells, although slightly less in duration." AR 192. Post-surgery she was "pretty much house bound" because the episodes were completely unpredictable. AR 199. She gave up driving on her own because she experienced episodes while driving and "had to immediately pull over and have someone come pick [her] up." *Id.* Dr. Hodgson scheduled Delaney in six weeks for a videonystagmography ("VNG") test and planned to "proceed to gentamicin injection" if Delaney was "still having enough trouble" afterwards. AR 192.

By mid-June 2012, Delaney was experiencing three to four episodes of vertigo, nausea and vomiting three to four times per week, as well as fluctuating hearing loss, ringing/pulsing constant tinnitus, aural fullness, otalgia, sound distortion and sensitivity, constant "offness/out of body sensation," and memory and concentration difficulty. AR 202; *see also* AR 211. On June 11, 2012, Delaney underwent VNG testing which showed "a 42% reduced vestibular response in her left ear, with left sided positional nystagmus." AR 201. At that point, she was experiencing three episodes per week, but felt that the shunt had made the episodes somewhat shorter and had shortened her recovery time. *Id.* Delaney elected not to have the gentamicin injection at that point. *Id.*

By November 19, 2012, Delaney had "worsened again." AR 305. She was unable to drive and "rarely leaves the house any longer" due to the frequency of her Meniere's attacks which were unpredictable and resulted in ataxia, nausea and vomiting. *Id.* She continued to suffer "severe" difficulties with symptoms, experiencing eight episodes over the prior seven days, including two in one day and one that awakened her from her sleep. *Id.* The episodes lasted "hours at a time" and were "associated with ataxia, nausea and vomiting." *Id.* Dr. Hodgson recommended that she proceed with a transtympanic injection of gentamicin. *Id.* She did so, which left her feeling "off balance" for four days. AR 313.

Despite the gentamicin injection, by March 25, 2013, Delaney was continuing to have episodes of vertigo, but reported tending "to get a little quicker recovery and sometimes [was] starting to feel closer toward normal." AR 306. However, the episodes were continuing, with one taking place while she was in the waiting room at Dr. Hodgson's office. *Id.*

## IV. *Claim for LTD Benefits*

After she stopped working on March 21, 2012, Delaney filed a claim for LTD benefits on or about May 8, 2012, alleging disability due to severe vertigo, vomiting, and other symptoms of Meniere's disease and stating that her "Return to Work Target Date" was "unknown." AR 115, 126–27.

On June 12, 2012, Brenda Mower–Teboe, RN, reviewed Delaney's medical records. AR 104–06. Nurse Teboe found Delaney's assertions of symptomology inconsistent with medical records after April 5, 2012, indicating improvement since surgery and with the "fact" that Delaney was able to drive a car and had not had her license restricted. *Id.* One day later based on Nurse Teboe's review, Prudential denied Delaney's claim for LTD benefits and catastrophic disability benefits. AR 101, 193–96. Prudential acknowledged Delaney's work interruption as of March 22, 2012, due to surgery, but found: (1) improvement following surgery; (2) a failure to follow through on the recommendation to receive psychological counseling and no evidence of psychological decompensation; and (3) a lack of severity of symptoms for both Meniere's disease and Chronic Depression/Anxiety. AR 195. In particular, Prudential found that Delaney was still able to drive, which was indicative of her ability to perform sedentary work. *Id.*

## V. *Appeals*

### A. *First Appeal*

Delaney submitted her first written appeal on July 25, 2012. AR 198–99. She included updated medical records from Drs. Czarnecki and Hodgson, as well as records from her counselor, Psychiatric/Mental Health Nurse Practitioner Elisabeth Curry. Delaney described the symptoms of her Meniere's disease as including: (1) "episodes" or "attacks" of ver-

tigo and vomiting that last up to two hours, followed by long periods of fatigue; (2) episodes occurring three to four times per week; (3) fear and anxiety, stress and panic attacks related to the fear brought on by not knowing when an episode will occur; (4) residual effects lasting for one to two days and including significant fatigue, and difficulties with thinking, memory and concentration. AR 198–99. She also advised Prudential that she had been "pretty much house bound" following the surgery and no longer attempted to drive by herself as she had experienced episodes while driving. AR 199.

Prudential ordered three days of surveillance of Delaney. AR 215. As a result, over Labor Day weekend, September 1–3, 2012, approximately one hour and nine minutes of video were recorded. AR 226. It shows Delaney riding in the car with her husband to and from the coast; taking short breaks for snacks and the bathroom along the way; unloading items from the car upon arrival; walking two dogs; and attending a social gathering while at the coast. Delaney was out of sight during most of the three days.

Prudential also ordered a review of Delaney's medical records by a clinical psychologist, Richard I. Frederick, Ph.D. AR 243–46. Dr. Frederick found no support for the conclusion that Delaney suffers from any psychological disorder, including depression or an anxiety disorder. AR 245–46. Accordingly, he endorsed no restrictions or limitations arising from her psychological condition. *Id.*

On September 21, 2012, Prudential asked Dr. Martin Gizzi, who is board certified in Neurotology/ENT and Ophthalmology, to review Delaney's record. AR 241–42. In his report dated October 9, 2012 (AR 248–50), Dr. Gizzi concluded that Delaney's symptoms were related to unilateral vestibular hypofunction, not to Meniere's disease:

Ms. Delaney has objective evidence supporting the diagnosis of unilateral vestibular hypofunction. This was likely due to a viral labyrinthitis which affected both auditory and vestibular function. There is no objective evidence in the records reviewed to support a diagnosis of Meniere's disease. There was, however, strongly suggestive symptomatic evidence of Meniere's disease in Ms. Delaney's records prior to the endolymphatic shunt surgery. Ms. Delaney's symptoms since the surgical placement of her endolymphatic shunt, however, are not consistent with Meniere's disease, but may indicate ongoing symptoms of unilateral vestibular hypofunction.

AR 249.

Accordingly, Dr. Gizzi found no restrictions or limitations on Delaney's functioning, other than a restriction against balancing and working at unrestricted heights. AR 249–50.

On October 27, 2012, relying on the reports by Drs. Frederick and Gizzi and the video surveillance, Prudential upheld its decision to deny Delaney's claim for benefits. AR 252–56. Upon reconsideration, Prudential recounted the information submitted by Delaney and her husband about the symptoms she experiences (AR 253–54), identified objective testing which showed hearing loss, left vestibular hypofunction, and spontaneous nystagmus (AR 255), and noted Dr. Hodgson's opinion that Delaney's "symptoms are . . . . consistent with Meniere's [disease]" (*id.*). However, parroting selected portions of the letters from Drs. Frederick and Gizzi, Prudential found "no objective evidence in the records reviewed to support a diagnosis of Meniere's disease" and no basis to conclude "that she has any medically necessary restrictions and/or limitations from any psychological conditions." *Id.* Pru-

dential also recounted the details of the video surveillance, claiming that Delaney engaged in "extended activities" in the few days following an attack of August 30, 2012, "while appearing relaxed, outwardly happy, with no evidence of distress, panic, anxiety or fearfulness." AR 254. Based on Dr. Gizzi's opinion, Prudential concluded that Delaney is restricted from balancing or working at unrestricted heights which are compatible with performing her "regular occupation" as an escrow officer. AR 255.

### B. *Second Appeal*

Delaney filed a second appeal on April 15, 2013. AR 261–85. After reviewing the claims handling by Prudential (AR 261–63), she stated that her Meniere's disease symptoms may come with or without warning (AR 264) and that Dr. Hodgson had characterized her symptoms as "progressive and intractable" which did not resolve after her March 2012 surgery. AR 190, 265–66, 275–79. She added that Dr. Czarnecki confirmed that she was disabled (AR 266–67) and that Nurse Curry also concluded that her symptoms had a severe impact on her ability to function normally. AR 267. Delaney also described how the video surveillance showed "snap shots" of her daily life and passive, rather than vigorous, activity consistent with her limitations. AR 268–72. She explained that that she was able to engage only in limited activities, that her visit was cut short, and that she spent September 3, 2012, at home resting which is consistent with her alleged symptoms. She also pointed out how her own submissions, including her journal entries, as well as statements from her friends and family, document frequent and acute Meniere's symptoms that prevent sustained work in any occupation. AR 279–85. Delaney also submitted updated medical records.

On May 27, 2013, Dr. Gizzi examined the records submitted in support of Delaney's second appeal and issued a report. AR 349. He acknowledged that Delaney's condition was strongly suggestive evidence for Meniere's disease and that she had undergone definitive treatment for Meniere's disease, including receiving a surgical shunt and gentamicin injections. AR 350. He stated that Dr. Hodgson provided no reasons for the lack of response to the treatment and that the record revealed no evidence to support ongoing Meniere's disease, such as fluctuating hearing loss, nystagmus during an episode, or documentation of continued vestibular nerve function on the left. *Id.* He found that the video did not provide support for diagnosis of ongoing Meniere's disease, as he would not expect someone in the middle of experiencing vertigo to be able to walk unsupported. *Id.* Thus, he did not change his opinion. *Id.*

Prudential also asked Dr. Frederick to review Delaney's updated medical records and journal entries. Dr. Frederick submitted a follow-up report dated June 25, 2013, finding no additional information concerning Delaney's emotional stress, except her journal entries of sometimes becoming fearful after experiencing vertigo. AR 354–56. He concluded that no additional information addressed whether Delaney has a psychological disorder or any medically necessary restrictions and/or limitations related to a psychological disorder. AR 355.

In a letter dated July 8, 2013, Prudential again upheld its decision to deny Delaney's claim for benefits. AR 361–364. Prudential discussed the lay testimony submitted by Delaney (AR 362–63), Dr. Hodgson's reports of gentamicin injections with "only mild response to treatment and inadequate control of symptoms" (AR 363), and excerpts of Delaney's journal (*id.*). Prudential again noted that Delaney's job is sedentary and requires no balancing, lifting,

pulling, or climbing. AR 362. Relying on the reports from Drs. Gizzi and Frederick, Prudential concluded that no evidence supported any restrictions on Delaney's ability to perform her "regular occupation" and that Delaney was not disabled from performing her regular occupation. AR 364. Prudential informed Delaney that she no longer could appeal Prudential's decision to Prudential, but could file suit. *Id.*

## CONCLUSIONS OF LAW

### I. *Critical Facts*

 At its core, Prudential's denial of Delaney's request for LTD benefits turns on a few critical facts. First, Prudential repeatedly points out that Delaney continued to work between her initial diagnosis with Meniere's disease in April 2010 and her shunt surgery in March 2012. Prudential then emphasizes that Delaney's job was "sedentary," requiring no lifting, pulling, pushing, balancing, climbing or other complex motor activities, and that her vertigo ·was episodic, apparently to denote that her symptoms do not render her continuously disabled. Finally, Prudential asserts that Delaney still drives and has not had her license restricted to discount Delaney's assertions of disabling symptoms. Bolstered by downgrading of Delaney's symptoms to episodic vertigo and by asserting that she improved after surgery, Prudential then concludes that Delaney can perform her former sedentary job as an escrow officer.

Although· Delaney's job as an escrow officer was sedentary, the rest of Prudential's factual conclusions are fundamentally flawed. Delaney suffers more than episodic vertigo and, with the exception of the first couple of weeks post-surgery, the record does not support the factual conclusion that her symptoms improved. She ceased driving and doing other activities when she is home alone and returned to intractable symptoms within weeks post-surgery.

Prudential cites a host of cases to support its contention that Delaney's vertiginous spells are an insufficient basis on which to find her disabled. *See Bardill v. Lincoln Nat'l Life Ins.*, No. 09–03025, 2011 WL 891141, at *8 (N.D.Cal.2011), *aff'd*, 518 Fed.Appx. 543 (9th Cir.2013) (plaintiff's vertigo and tinnitus did not prevent her from working in a sedentary job)·; *Holifield v. UNUM Life Ins. Co. of Am.*, 640 F.Supp.2d 1224, 1232 (C.D.Cal.2009) (upholding denial of benefits involving vertigo); *Feigenbaum v. Merrill Lynch & Co., Inc.*, 308 Fed.Appx. 585, 587 (3rd Cir.2009) (evidence did not support plaintiff's claim that vertigo precluded her from working); *Corry v. Liberty Life Assurance ·Co. of Boston*, 499 F.3d 389, 398 (5th Cir.2007) (affirming denial of benefits where plaintiff complained of dizziness and inability to drive); *Grosvenor v. Qwest Commc'ns Int'l*, 191 Fed.Appx. 658, 663 (10th Cir. 2006) (affirming judgment for administrator who did not ignore reports of vertigo); *Allen v. UNUM Life Ins. Co. of Am.*, 142 Fed.Appx. 907, 912–13 (6th Cir.2005) (affirming denial of benefits for symptoms of Meniere's disease); *Ferrari v. Teachers Ins. & Annuity Ass'n*, 278 F.3d 801, 807– 08 (8th Cir.2002) (affirming denial· of benefits based on a claim of Meniere's disease). However, those cases uniformly involved reviews under an abuse of discretion standard, and only two involved diagnoses of Meniere's disease, neither of which are analogous to Delaney's claim. One upheld the denial of benefits based the complete lack of any objective testing, the inconsistency between the claimant's activities of driving and traveling out-of-state to assist her mother rather than having recommended surgery, and the claimant's failure to seek regular care or consultations with her doctors. *Allen*, 142 Fed.Appx. 907, at 912–13. None of those facts describe Delaney. The other case involved a physician who experienced a sudden hearing loss,

but not the vertigo and associated ataxia, nausea, vomiting, hours of severe fatigue, and days of foggy-headedness experienced by Delaney. *Ferrari*, No. 4:99–cv–00755–RWS, Memorandum and Order (docket # 24) (E.D.Mo., Nov. 27, 2000).

In contrast, the two cases cited by Delaney allowing benefits involved *de novo* review and describe symptoms that more closely resemble those in this case. Those symptoms involved "violent vertigo" attacks "occurring on almost a daily basis," *Tinker v. Versata, Inc. Grp. Disability Income Ins. Plan*, 566 F.Supp.2d 1158, 1161, 1166 n. 5 (E.D.Cal.2008), and "severe dizziness, loss of balance, and incapacitating vertigo," *Frohn v. Provident Life & Acc. Ins. Co.*, No. EDCV 03–368 FMC, 2006 WL 2590458, at *3 (C.D.Cal. Aug. 23, 2006).

## A. *Record Reviews*

In addition to a limited and skewed presentation of Delaney's work history and medical record, Prudential's denial hinges on record reviews by two physicians and a mere hour of video surveillance. As noted above, Prudential had Delaney's records reviewed first by Nurse Teboe (AR 104–06 (June 12, 2012)), then twice by both Dr. Frederick (AR 243–46 (October 4, 2012) & AR 354–56 (June 25, 2013)) and Dr. Gizzi (AR 248–50 (October 9, 2012) & AR 349–50 (May 27, 2013)). Prudential also ordered three days of video surveillance of Delaney over Labor Day weekend in September 2012.

Prudential wholly failed to explain how Delaney's continuing symptoms, whether derived from Meniere's disease or some other ailment such as the one offered by Dr. Gizzi, are consistent with working at any occupation, much less her job as an escrow officer. The implication in Prudential's decisions—although not expressly stated—is that Delaney is exaggerating the severity or frequency of her attacks, yet nothing in the record supports such a conclusion.

To the contrary, statements from three persons who witnessed her acute episodes describe in detail how they interfere with her physical and cognitive ability to attend to any task, much less work activity. Her daughter wrote that she had "never in my career as a paramedic seen anything this severe that did not result from heart attack or stroke," could do nothing medically to help, and confirmed that Delaney "will not drive or leave the house without someone that she trusts" due to the intensity and unpredictability of the attacks. AR 283, 328–29. Observing one of Delaney's attacks during a walk after dinner in July 2012, one friend described it as "probably one of the most disturbing health crises I have ever witnessed and helped with." AR 284, 330–31. Another friend witnessed another similarly acute episode in June 2012. AR 284, 332.

The video surveillance shows nothing inconsistent with the medical or other evidence in the record concerning the limitations imposed by Delaney's primary diagnosis of Meniere's disease. *See* AR 227–35, 244, 324–27. Although Prudential characterizes Delaney's conduct during the surveillance as "active" and "engaging in activities away from her residence," Delaney's activities were considerably curtailed from their usual level under similar circumstances for the 20 years prior to the onset of her Meniere's disease symptomology. AR 324–25. She rode in the car as a passenger; took only brief breaks during the long drives; carried only her emergency bag into the house at the coast; stood quietly near the door where her family was available to help if needed; took only brief walks with the dogs accompanied by her husband; did not take the usual beach walks; left a day earlier than usual; and slept late and rested all

day on Monday. AR 347–51. Delaney does not purport to be incapacitated by her symptoms every moment of every day or unable to leave her home when accompanied. When viewed in the context later supplied by Delaney, the video surveillance supports her testimony.

Dr. Hodgson, Delaney's treating physician who specializes in otologic conditions, including Meniere's disease, has treated Delaney since her increasing symptoms prompted her to request a referral in June 2011. AR 166, 168. On April 5, 2013, he documented the increase in Delaney's symptoms and cogently explained both the basis of his opinions and how they track the published guidelines on the diagnosis and evaluation of therapy in patients with Meniere's disease. AR 295–98. According to Dr. Hodgson, Delaney suffers from "progressive and intractable Meniere's disease in her left ear." AR 190, 295. Meniere's disease is a clinical diagnosis and, in Delaney's case, is supported by "hearing loss in the left ear" of a "low frequency," both before and after the shunt procedure, "fluctuating tinnitus and aural fullness in the left ear," and sudden "episodes of true spinning vertigo, all of which last greater than 20 minutes" and "often several hours at a time." AR 295–96. These episodes "are unpredictable, intense, and consist of intense spinning, difficulty walking or even standing, nausea and vomiting" and "aggravated by any type of movement." AR 297. He explained why Dr. Gizzi's conclusions are incorrect and was "stunned that he would discount the diagnosis of Meniere's disease." AR 297.

Prudential may not have been required to accord Dr. Hodgson's opinion "special weight," but it was not free to refuse to credit Delaney's reliable evidence, including the opinions of her treating doctors. *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 833, 123 S.Ct. 1965, 155 L.Ed.2d 1034 (2003). Moreover, given *de novo* review, the question is not whether Prudential abused its discretion in disregarding Dr. Hodgson's opinions or rejecting them in favor of the contrary opinions of a physician who reviewed the medical record. Instead, the question is whether the preponderance of the evidence establishes that Delaney's symptoms prevent her from performing the material and substantial duties of her regular job.

On this record, the only reasonable conclusion is that Meniere's disease can cause symptoms which vary in intensity and persistence and that Delaney happens to be among the unfortunate few whose symptoms are "progressive and intractable," unresponsive or only mildly responsive to invasive and destructive interventions. Prudential steadfastly focuses on the lack of certain physical requirements in the escrow officer job (pushing, pulling, balancing, lifting items weighing more than 10 pounds and the like) and intimates that Delaney failed to meet her burden because her symptoms affect her only episodically, rather than "continuously." AR 255, 363. However, the relevant inquiry is whether Delaney is able to perform the "material and substantial duties" of her "regular occupation." Delaney's regular job required 40 hours of work per week and regular attendance. AR 122. By the time she sought a referral to a specialist after her symptoms increased in mid–2011, Delaney had already begun to exhaust her sick leave, which belies the conclusion that she was able to perform her job duties despite her symptoms. AR 166.

Regular job attendance is a requirement of virtually all jobs, and certainly a requirement of those jobs which would provide the requisite income to disentitle Delaney to LTD benefits under the Plan if she could otherwise perform them. In the social security context, legions of cases

rest in whole or in part on vocational expert testimony that missing two or more days of work per month renders a claimant unemployable. *See, e.g., Ghanim v. Colvin,* 763 F.3d 1154, 1159 (9th Cir.2014) (missing two or more days per month would preclude work as a kitchen helper or commercial cleaner); *Brewes v. Comm'r of Social Sec. Admin.,* 682 F.3d 1157, 1163 (9th Cir.2012) (missing two or more days per month would make claimant unemployable as a photocopying machine operator, laundry worker, or janitor); *Yurt v. Colvin,* 758 F.3d 850, 855 (7th Cir.2014) (vocational expert testimony that "in competitive employment workers were expected to be on task 80 to 85 percent of the time and could not miss more than one or two days per month and up to approximately ten per year"); *Garcia v. Colvin,* 741 F.3d 758, 760 (7th Cir.2013) (vocational expert testimony that "a worker who misses work more than one day a month (beyond sick days, vacation days, and other authorized leave) would 'have difficulty sustaining competitive employment'"); *Douglas v. Bowen,* 836 F.2d 392, 396 (8th Cir.1987) (vocational expert testimony that if the claimant "had more than two absences a month due to his impairments, he could not find work in the national economy").

The record conclusively establishes that Delaney would miss more than two days of work per month due to the severe attacks she regularly and unpredictably suffers and the hours of fatigue that follow. Even assuming that Delaney could perform her job as an escrow officer in the days after such an attack, the episodes and their immediate aftermath are sufficiently severe and occur with sufficient regularity that she would be absent from work at least two days per month, which in and of itself precludes employment. The implication that Delaney simply suffers from transitory vertigo from which she quickly recovers is untenable. Assuming that Delaney could find refuge at work sufficient to en-

dure the initial vertigo, nausea, ataxia, and vomiting that accompany her episodes, the severe fatigue that follows, necessitating that she sleep for several hours, would constitute an unscheduled break or absence from work that would prevent her from performing the duties of any job.

Putting aside for the moment whether Delaney could perform her job on every "episode-free" day, including those that immediately follow a day on which she has an "episode," the great weight of the evidence indicates that she is precluded from employment by the number of days she has episodes and the resulting hours of incapacity she suffers on those days. Delaney has more than met her burden of establishing that she not able to perform the material and substantial duties of her former job as an escrow officer.

■■■ This same evidence leads to the inevitable conclusion that Delaney also is unable, after the first 24 months of payments, to perform the duties of "any gainful occupation for which [she is] reasonably fitted by education, training or experience." However, Prudential argues that the only issue raised by Delaney's appeal is her disability from her "regular occupation" for the first 24 months under the Plan and that it has not yet determined whether Delaney is disabled from "any gainful occupation."

As Delaney points out, her second appeal dated April 15, 2013, specifically states that she is "unable to work because she cannot maintain the attendance and persistence required in any gainful occupation." AR 261. Although Prudential cited both of the disability provisions based on in inability to perform a "regular occupation" and "any gainful occupation," it denied that appeal based only the "regular occupation" provision. Of course, at that time in July 2013, Delaney was still within the first 24 months after stopping work.

Therefore, Prudential had no need to address her disability under the "any gainful occupation" provision.

As of April 2013, Dr. Hodgson stated that Delaney "is completely disabled by her symptoms and unable to perform work of any type, let alone one that involves concentration and high cognitive functioning such as an Escrow Officer." AR 297. The record reveals no change in Delaney's condition by July 2013 when the record ends. The question then is whether Delaney's condition had any reasonable prospect of improving over time, such that after 24 months (ending in March 2014), she would be able to perform the duties of "any gainful occupation." Given that she has not responded to medical or surgical treatment and given Dr. Hodgson's description of her Meniere's disease as "progressive and intractable," this court concludes that Delaney has met her burden of proving that she is disabled from "any gainful occupation."

Accordingly, Delaney should be awarded LTD benefits under both the "regular occupation" and the "any gainful occupation" provisions of Prudential's policy until she is no longer disabled.

## REMEDIES

In her cross-motion, Delaney seeks: (1) an award of LTD benefits commencing June 20, 2012, in the amount of $2,279.00, less the amount of her Social Security disability offset under the terms of the Plan through the date of judgment, without any remand to Prudential; (2) an award of prejudgment interest at the Oregon statutory rate; and (3) an Order imposing certain restrictions on Prudential's future review of her entitlement to LTD benefits. The first of these requests should be granted; the second should be denied with leave to renew; and the third should be denied.

## I. Judgment and Interest Rate

 In addition to an award of LTD benefits, Delaney seeks an award of prejudgment interest at Oregon's statutory rate of 9% pursuant to ORS 82.010, rather than the current and substantially lower federal post-judgment interest rate pursuant to 28 U.S.C. § 1961(a). "A district court may award prejudgment interest on an award of ERISA benefits at its discretion." *Blankenship v. Liberty Life Assur. Co. of Boston*, 486 F.3d 620, 627 (9th Cir.2007) (citations omitted). The exercise of that discretion must be guided by fairness and a balancing of the equities. *Landwehr v. DuPree*, 72 F.3d 726, 739 (9th Cir.1995) (citations omitted). The purpose of prejudgment interest is to fully compensate the plaintiff for "the losses incurred as a result of [the defendant's] nonpayment of benefits." *Dishman v. UNUM Life Ins. Co. of Am.*, 269 F.3d 974, 988 (9th Cir.2001) (holding that the district court abused its discretion in awarding a 16% prejudgment interest rate on an ERISA award, double the rate of return on defendant's investment portfolio). Fairness and a balance of the equities favors the award of some measure of prejudgment interest to Delaney to compensate her for the delay in payment of benefits. As explained in *Fleming v. Kemper Nat'l Servs., Inc.*, 373 F.Supp.2d 1000, 1013 (N.D.Cal.2005), prejudgment interest is appropriate when "[t]here is no evidence that defendants would suffer financial hardship by paying prejudgment interest to [plaintiffs,] nor that any other beneficiary of the plans would suffer as a result." Thus, the issue is the appropriate interest rate to charge Prudential.

 "The interest rate prescribed for post-judgment interest under 28 USC § 1961 is appropriate for fixing the rate of pre-judgment interest unless the trial judge finds, on substantial evidence, that

the equities of that particular case require a different rate." *Grosz–Salomon v. Paul Revere Life Ins. Co.*, 237 F.3d 1154, 1164 (9th Cir.2001), quoting *Nelson v. EG & G Energy Measurements Grp., Inc.*, 37 F.3d 1384, 1391 (9th Cir.1994). "Substantial evidence" for a different rate is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Blanton v. Anzalone*, 813 F.2d 1574, 1576 (9th Cir.1987) (quotation and citations omitted). According to 28 U.S.C. § 1961(a), "interest shall be calculated from the date of the entry of the judgment, at a rate equal to the weekly average 1–year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding [ ] the date of the judgment."

The difficulty with Delaney's request is the lack of any evidence regarding an appropriate interest rate, other than general statements to the effect that the award of prejudgment interest at below market rates does not fully compensate a prevailing party. This is likely due to the focus by the parties on their cross motions towards the legal sufficiency of Prudential's denial of LTD benefits, not the availability of, or appropriate rate of, prejudgment interest. Rather than foreclose evidence or argument on that issue, the more appropriate course is to deny this portion of Delaney's motion, with leave to renew.

## II. *Prohibitions on Prudential's Future Conduct*

 Finally, Delaney seeks an Order prohibiting Prudential from: (a) requiring her to submit updated information more than once per year; (b) requiring her to attend any examination without substantial clinical evidence of an improvement sufficient to show that she might have the capacity to return to a gainful occupation as defined in the policy; and (c) contacting her physicians by telephone. Delaney asserts that this court may exercise its equitable power under ERISA to award this relief, citing *Godfrey v. BellSouth Telecomms., Inc.*, 89 F.3d 755, 759 (11th Cir. 1996). In that case, the employer told the claimant with fibromyalgia to come to work or be fired, forcing her to "dope herself up with the medications that had been prescribed for her and get in the car, contrary to medical advice, drive herself to work, and then work while under the influence of a combination of very potent drugs." *Id.* at 759. To remove an employer's incentive to "threaten or cajole a disabled employee into returning to work [and thereby] obtain the rewards of having an employee in that position without hiring a replacement and without paying anything in benefits," the Eleventh Circuit disallowed a wage offset.[3]

In response to Delaney's trifecta of requests for equitable relief, Prudential waxes about the court's lack of authority to order relief which steps outside the written provisions of the Plan. While these arguments pose an interesting issue about the breadth of equitable relief available under ERISA, they are not properly before this court at this juncture.

Encompassed within ERISA are two complementary civil enforcement provisions:

---

**3.** Delaney also cites cases in which two district courts refused to enforce a plan provision ending LTD coverage and awarded additional monetary compensation. However, both of those cases were later reversed or vacated on appeal. *Zebrowski v. Evonik Degussa Corp Admin. Comm.*, No. 10–542, 2012 WL 5881846 (E.D.Pa. Nov. 20, 2012), *rev'd*, 578 Fed.Appx. 89 (3rd Cir.2014) and *Smith v. Bayer Corp. Long Term Disability Plan*, 444 F Supp2d 856, 875 (E.D.Tenn.2006), *aff'd in part, vacated in part*, 275 Fed.Appx. 495 (6th Cir.2008).

The first permits a beneficiary "to recover benefits due to him under the terms of his Plan." [29 USC] § 1132(a)(1)(B) ("a(1)"). The second provides that "a participant, beneficiary, or fiduciary" may sue "(A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or.(B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the Plan." [29 USC] § 1132(a)(3) ("a(3)").

*LaRocca v. Borden, Inc.*, 276 F.3d 22, 27 (1st Cir.2002).

In her Complaint, Delaney specifically requests relief under only 29 U.S.C. § 1132(a)(1), plus costs and attorney fees under 29 U.S.C. § 1132(e)–(g). Complaint, ¶¶ 1, 20, 21, 23, & Prayer. In contrast, she cites 29 U.S.C. § 1132(a)(3) only in reference to an allegation that Prudential is the Claims Administrator. *Id.*, ¶ 9. Except to the degree she seeks "such other relief as this court deems just and proper," Delaney does not allege any specific equitable or injunctive relief, nor does the Complaint hint that she should be awarded prospective relief, other than future LTD benefits, namely "a monthly benefit under the Plan through age 65, so long as [she] remains totally disabled." *Id.*, Prayer, ¶ 2.

In contrast to the specific relief requested in her Complaint, and to the type of relief ordered in *Godfrey*, Delaney's cross-motion seeks injunctive relief in the form of an order restricting Prudential's future claims processing activities. Other than not being encompassed by the Complaint, this request faces two other obstacles. First, to the extent it is couched in assertions that Prudential breached a fiduciary duty, it is a strictly individualized claim which could not proceed even if alleged. *Cinelli v. Security Pac. Corp.*, 61 F.3d 1437, 1445 (9th Cir.1995) (citation omitted) ("Individual beneficiaries may bring fiduciary actions against the plan fiduciaries, but they must do so for the benefit of the plan and not their individual benefit."). Second, Delaney has not cited, nor has this court located, any case imposing these sorts of prospective restrictions on benefit processing activities by an ERISA claims administrator. Although somewhat analogous cases involve requests for both reversal of a benefits denial and a prospective injunction, they carefully circumscribe the equitable relief to prevent going beyond the record or hamstringing future claims processing. For example, in a class action involving Applied Behavioral Analysis ("ABA") therapy for autistic children, the court granted declaratory relief that the denial of benefits for ABA therapy was arbitrary and capricious, but denied plaintiffs' "request for a permanent injunction because th[e] record [was] insufficient to determine whether future denials of claims, pursuant to plan language, medical policies, and scientific research that are not before the Court, will be arbitrary and capricious." *Potter v. Blue Cross Blue Shield of Mich.*, No. 10–cv–14981, 2013 WL. 4413310, at *12 (E.D.Mich., Mar. 30, 2013).

The many failures or missteps identified by Delaney are adequately addressed by this court's *de novo* review of Prudential's claim denial, the award to Delaney—though belatedly—of the LTD benefits to which she is entitled, and the opportunity for her to request prejudgment interest to adequately compensate her for the delay in payment, as well as statutory attorney fees. Given this decision, it is highly unlikely that Prudential will take any adverse action against her without carefully considering the cost of defending a legal challenge.

**1234**

### RECOMMENDATIONS

Prudential's Motion (docket # 25) should be DENIED and Delaney's Cross–Motion (docket # 26) should be GRANTED IN PART and DENIED IN PART. Accordingly, (1) Delaney's request for a Judgment declaring that she has satisfied her burden of proof under both the "regular occupation" and the "any gainful occupation" standards of Prudential's policy, and granting her LTD benefits from June 20, 2012, through the date of judgment should be GRANTED; and (2) Delaney's request for prejudgment interest at the Oregon statutory rate should be DENIED WITH LEAVE TO RENEW; and (3) in all other respects, Delaney's motion should be DENIED.

### SCHEDULING ORDER

The Findings and Recommendation will be referred to a district judge. Objections, if any, are due Thursday, December 04, 2014. If no objections are filed, then the Findings and Recommendation will go under advisement on that date.

If objections are filed, then a response is due within 14 days after being served with a copy of the objections. When the response is due or filed, whichever date is earlier, the Findings and Recommendations will go under advisement.